1  Thomas E. Viloria, Esq.
   Nevada Bar No. 003833
2  FAHRENDORF, VILORIA,
      OLIPHANT & OSTER L.L.P.
3  P.O. Box 3677
   Reno, NV 89509
4  (775)348-9999

5  Counsel for DAVID GONZALEZ

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                         FOR THE DISTRICT OF NEVADA

                                    * * *

10 UNITED STATES OF AMERICA     )
                                )
11              Plaintiff,       )       Case No. 3:11-CR-00055-HDM-WGC
                                )
12     vs.                       )       **DEFENDANT'S REDACTED SENTENCING**
                                )              **MEMORANDUM**
13 DAVID GONZALEZ,              )
                                )
14              Defendant.       )
   _____)

15

16       David Gonzalez is twenty-six years old.  He has never been arrested or charged with a

17 criminal offense.  He has been readily employed since 2005.  He worked at Wayne's Automotive

18 from July 2005 to July 2009 and at Office Depot from December 2009 to September 2010.  He

19 worked approximately four months at Best Buy just prior to his arrest on April 6, 2011.  During

20 the brief periods of unemployment, he has been supported by his parents.  Mr. Gonzalez will be

21 sentenced by the Court for the offense of Receipt of Child Pornography.  Undoubtedly, the

22 circumstances of his case do not differ from many of the other such cases that have come before

23 this Court and other courts across the United States.

24       The Probation Department is recommending a prison term of 97 months.  This

25 recommendation is based in part on "The probation officer has not identified any factors under

26 18 U.S.C. § 3553(a) that may warrant a variance and imposition of a non-guideline sentence."

27 See Presentence Investigation Report, page 16, paragraph 94.  A copy of the letter outlining

28 Defendant's objections dated 9/26/2012 is attached hereto as Exhibit 1.  There are factors that

*Left margin (rotated text):*
ATTORNEYS AND
COUNSELORS AT LAW
Office: (775) 348-9999 Fax: (775) 348-0540
P. O. BOX 3677 ~ RENO, NEVADA 89505
327 CALIFORNIA AVENUE ~ RENO, NEVADA 89519

FAHRENDORF,
VILORIA,
OLIPHANT
& OSTER L.L.P.

1

ATTORNEYS AND
COUNSELORS AT LAW
Office: (775) 348-9999 Fax: (775) 348-0540
P. O. BOX 3677 ~ RENO, NEVADA 89505
327 CALIFORNIA AVENUE ~ RENO, NEVADA 89519

FAHRENDORF,
VILORIA,
OLIPHANT
& OSTER L.L.P.

1  warrant a variance.  Mr. Gonzalez has no criminal history.  18 U.S.C. § 3553(a)(1); Mr.

2  Gonzalez was mentally and physically abused by his mother.  18 U.S.C. § 3553(a)(1); Mr.

3  Gonzalez was sexually abused by          from the ages of 7 to 12.  18 U.S.C. § 3553(a)(1); and

4  Mr. Gonzalez since the age of 18 has suffered from mental illness to include at times: depression,

5  bipolar disorder, anxiety, Schizophrenia, Schizoaffective Disorder.  18 U.S.C. § 3553(a)(1);

6       Mr. Gonzalez's advisory guideline range is determined by USSG §2 G2.2 and is 97 to

7  121 months.  Application of the guideline in Mr. Gonzalez's case would lead to a sentence that is

8  inconsistent with what is required by 18 U.S.C. § 3553, a sentence below the advisory guideline

9  rage would be "sufficient, but not greater than necessary," to comply with the goals of

10 sentencing established by Congress.  18 U.S.C. § 3553(a).

11      Mr. Gonzalez recognizes the harm associated with child pornography.  "The simple fact

12 that the images have been disseminated perpetuates the abuse initiated by the producer of the

13 materials." United States v. Goff, 501 F. 3d 250, 259 (3rd Cir. 2007).  Mr. Gonzalez also

14 understands that those who collect child pornography also create a market for the images. *Id.* at

15 501 F. 3d at 260.

16      However, the guideline applicable to Mr. Gonzalez' s case "is fundamentally different

17 from most and that, unless applied with great care, can lead to unreasonable sentences that are

18 inconsistent with what section 3553 requires." United States v. Dorvee, 616 F. 3d 174, 184 (2nd

19 Cir. 2010).

20      The formulated Guidelines for child pornography and the the increases over the years

21 have not been based on empirical data and are arbitrary and as a result, the guideline does not

22 distinguish between run-of-the-mill offenders like Mr. Gonzalez and those whose conduct is

23 deserving of greater punishment. *See* Dorvee, 616 F.3d at 184-186.  ("Consequently, adherence

24 to the Guidelines results in virtually no distinction between the sentences for defendants like

25 Dorvee, and the sentences for the most dangerous offenders who, for example, distribute

26 pornography for pecuniary gain and who fall in higher criminal history categories."). *Id at 187.*

27      In Mr. Gonzalez's case, he received a two level increase in his offense level because the

28 images involved prepubescent minors, two levels because he used a computer, and five levels

1  because of the number of images.  As recognized in <u>Dorvee</u>, these particular enhancements

2  would apply in the vast majority of cases:

3       On top of that, many of the § 2G2.2 enhancements apply in nearly all cases. Of all
       sentences under § 2G2.2 in 2009, 94.8% involved an image of a prepubescent

4       minor (qualifying for a two-level increase pursuant to § 2G2.2(b)(2)), 97.2%
       involved a computer (qualifying for a two-level increase pursuant to §

5       2G2.2(b)(6)), 73.4% involved an image depicting sadistic or masochistic conduct
       or other forms of violence (qualifying for a four-level enhancement pursuant to §

6       2G2.2(b)(4)), and 63.1% involved 600 or more images (qualifying for a five-level
       enhancement pursuant to § 2G2.2(b)(7)(D)). n8 See United States Sentencing

7       Commission, Use of Guidelines and Specific Offense Characteristics for Fiscal
       Year 2009, available at http://www.ussc.gov/gl_freq/09_glinexgline.pdf (last

8       visited April 19, 2010).

9  <u>Id.</u> at 186.  These enhancements are in addition to an increase over time of the base offense level

10  to 22 which was not the result of any research or empirical evidence, but the result of the

11  Sentencing Commission's attempt "to square the guidelines with Congress's various directives."

12  <u>Id. See also</u> <u>United States v. Phinney</u>, 599 F.Supp.2d 1037, 1042-1043 (E.D. Wisc. 2009).

13      As the <u>Dorvee</u> court acknowledged many of the changes directed by Congress were

14  openly opposed by the Sentencing Commission:

15       The Commission has often openly opposed these Congressionally directed
       changes. For instance, the Commission criticized the two-level computer

16       enhancement (which is currently set forth at § 2G2.2(b)(6) and was adopted
       pursuant to statutory direction) on the ground that it fails to distinguish serious

17       commercial distributors of online pornography from more run-of-the-mill users.
       See United States Sentencing Commission, Report to Congress: Sex Offenses

18       Against Children Findings and Recommendations Regarding Federal Penalties,
       June 1996, at 25-30, available at http://www.ussc.gov/r_congress/SCAC.PDF

19       (last visited [*29] April 15, 2010). n7 Speaking broadly, the Commission has also
       noted that "specific directives to the Commission to amend the guidelines make it

20       difficult to gauge the effectiveness of any particular policy change, or to
       disentangle the influences of the Commission from those of Congress." See

21       United States Sentencing Commission, Fifteen Years of Guidelines Sentencing:
       An Assessment of How Well the Federal Criminal Justice System is Achieving

22       the Goals of Sentencing Reform, 2004, at 73, available at
       http://www.ussc.gov/15_year/chap2.pdf (last visited April 15, 2010).

23

24  <u>Id.</u> at 185-186.

25      In the final analysis, the court in <u>Dorvee</u> concluded that the within-guideline sentence

26  was substantively unreasonable.  It reached that conclusion, finding that the analysis used by the

27  Supreme Court with regard to the crack cocaine guideline was equally applicable to § 2G2.2:

28  / / /

ATTORNEYS AND
COUNSELORS AT LAW
Office: (775) 348-9999 Fax: (775) 348-0540
P. O. Box 3677 ~ Reno, Nevada 89505
327 California Avenue ~ Reno, Nevada 89519

FAHRENDORF,
VILORIA,
OLIPHANT
& OSTER L.L.P.

ATTORNEYS AND
COUNSELORS AT LAW
Office: (775) 348-9999 Fax: (775) 348-0540
P. O. Box 3677 ~ Reno, Nevada 89505
327 California Avenue ~ Reno, Nevada 89519

FAHRENDORF,
VILORIA,
OLIPHANT
& OSTER L.L.P.

In keeping with these principles, in Kimbrough, the Supreme Court held that it was not an abuse of discretion for a district court to conclude that the Guidelines' treatment of crack cocaine convictions typically yields a sentence "greater than necessary" to achieve the goals of § 3553(a), because those particular Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role." Kimbrough, 552 U.S. at 109-10. As we have explained here, the same is true for the child pornography enhancements found at § 2G2.2. Following Kimbrough, we held that "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." Cavera, 550 F.3d at 191. That analysis applies with full force to § 2G2.2.

Id. at 604 F. 3d 188.

The actual sentences imposed by judges across the nation implicitly recognize the shortcomings of § 2G2.2. In fiscal year 2009, there were more sentences imposed below the advisory guideline range than were within it. To be precise, 53% of all sentences imposed pursuant to § 2G2.2 fell below the advisory guideline range.[1]

In United States v. Stern, 590 F.Supp. 2d 945 (N.D. Ohio 2008), the defendant entered a guilty plea to possession of child pornography and faced a guideline range of 46 to 57 months. The defendant, unlike Mr. Gonzalez, received a two-level adjustment for distribution and, like Mr. Gonzalez, received a two-level increase for the use of a computer. He received a four-level increase for possessing more than 300 images but fewer than 600 images. The court recognized that "possession of child pornography is an exceedingly serious offense, among the most serious class of offenses that do not involve the direct use of violence or coercion on the part of the perpetrator." Id. at 951. Significantly, for purposes of Mr. Gonzalez's sentencing, the court in Stern concluded that a sentence of "twelve months and one day" was the appropriate sentence. Id. at 963.

---

[1]United States Sentencing Commission, *2009 Sourcebook of Federal Sentencing Statistics*, Table 28, available at www.ussc.gov/Data_and_Statistics/Annual_Reports_and_Sourcebooks/2009/Table28.pdf. Specifically, the report shows that 1,606 individuals were sentenced pursuant to § 2G2.2. Of those, 29 of the sentences were above the guideline range, 169 were described as "government sponsored" below guideline-sentences including 34 that were the product of substantial assistance, 82 were below-guideline departures, and 609 were below-guideline variances.

1    In reaching that decision, the court relied upon its view that when it came to imposing

2  sentences in child pornography cases, "the national sentencing landscape presents a picture of

3  injustice":

4    The Court has carefully considered an extremely wide variety of opinions from
   across the country as well as the National Guideline Statistics. n14 *See* United

5    States v. Newell, 35 Fed. Appx. 144, 145 (6th Cir. 2002) ("[The Guidelines are
   intended] to eliminate unwarranted sentence disparities nationwide.") (emphasis

6    added). The Court is deeply troubled by its findings: "anyone seriously concerned
   about federal sentencing disparities [must begin by] taking a very close look at

7    federal child porn cases." Professor Douglas A. Berman, Is There an Ivy-Leaguer
   Exception to Federal Child Porn Charges? (October 22, 2008), on-line at

8    http://sentencing.typepad.com. Based on the Court's review of the case law, it is
   clear that "one would be hard pressed to find a consistent set of principles to

9    explain exactly why some federal child porn defendants face decades in federal
   prison, some face many years in federal prison, while others only end up facing

10   months." *Id.* This Court is "struck by the inconsistency in the way apparently
   similar cases are charged and sentenced." [**44] Goldberg, 2008 U.S. Dist.

11   LEXIS 35723, at *5-6 (considering nearly two-dozen cases).

12   In short, the national sentencing landscape presents a picture of injustice. In the
   absence of coherent and defensible Guidelines, district courts are left without a

13   meaningful baseline from which they can apply sentencing principles. The
   resulting vacuum has created a sentencing procedure that sometimes can appear to

14   reflect the policy views of a given court rather than the application of a coherent
   set of principles to an individual situation. Individual criminal sentences are not

15   the proper forum for an expansive dialogue about the principles of criminal
   justice. Such conversation, though vital, should not take place here -- lives are

16   altered each and every time a district court issues a sentence: this is not a
   theoretical exercise. Yet, this Court is mindful of the appropriate scope of its

17   authority -- it must take the law as it finds it.

18  *Id.* at 961.

19    The guideline range in Mr. Gonzalez's case in applying § 2G2.2, does not reflect the

20  goals of sentencing established by Congress in 18 U.S.C. § 3553(a).  The guideline fails to

21  distinguish between more serious offenders and defendants such as Mr. Gonzalez.  A sentence

22  below the advisory guideline range of 97 to 121 months would be sufficient, but not greater than

23  necessary to achieve those goals.

24    Mr. Gonzalez suffers from significant mental health difficulties.  Since age 18, Mr.

25  Gonzalez has suffered from mental illness to include at times: depression, bipolar disorder,

26  anxiety, Schizophrenia, and Schizoaffective Disorder.  He has suffered emotional and physical

27  abuse at the hand of his mother from age seven until age thirteen.  He suffered emotional and

28  sexual abuse inflicted upon him by          over a period of at least five years which began

ATTORNEYS AND
COUNSELORS AT LAW
Office: (775) 348-9999 Fax: (775) 348-0540
P.O. BOX 3677 ~ RENO, NEVADA 89505
327 CALIFORNIA AVENUE ~ RENO, NEVADA 89519

FAHRENDORF,
VILORIA,
OLIPHANT
& OSTER L.L.P.

ATTORNEYS AND
COUNSELORS AT LAW
Office: (775) 348-9999  Fax: (775) 348-0540
P. O. BOX 3677 ~ RENO, NEVADA 89505
327 CALIFORNIA AVENUE ~ RENO, NEVADA 89519

FAHRENDORF,
VILORIA,
OLIPHANT
& OSTER L.L.P.

1  when he was five years old.  He was also sexually molested by a 15 year old boy.  Because of his

2  sad and disturbing unfortunate history he is not someone who is deserving of the 97 month

3  penalty for the offense which is recommended by the Probation Department.  A sentence less

4  than the 97–121 month recommended by the advisory guidelines would be would be "sufficient,

5  but not greater than necessary," to comply with the goals of sentencing. 18 U.S.C. § 3553(a).

6       Dr. Mahaffey has evaluated Mr. Gonzalez on several occasions and prepared

7  Psychosexual and Risk Assessment report dated May 13, 2011 and an Psychosexual and Risk

8  Assessment - Updated report dated September 17, 2011 (year should correctly read 2012).  A

9  copy of Dr. Mahaffey's Vita is attached hereto as Exhibit 2 and her reports are attached hereto as

10  Exhibits 3 and 4 respectively.

11      Dr. Mahaffey concludes in her first report that "[t]he SVR-20 suggests that Mr. Gonzalez

12  poses a low-moderate risk of sexual re-offense.  He does not pose a high risk of re-offense.  Most

13  offenders who score in the low risk range and many in the moderate risk range can be safely

14  supervised and treated in a community setting...Mr. Gonzalez fell into a risk category that

15  suggests he can be safely supervised in the community." See Exhibit 3, page 13.  In addition,

16  she opines, "[c]onsidering that Mr. Gonzalez has no prior hand-on or hands-off sex offense arrest

17  or conviction and has no prior criminal record, his prognosis for hands-on sex offenses, as well

18  as for recidivism with child pornography is favorable." See Exhibit 3, page 14.

19      Dr. Mahaffey met with Mr. Gonzalez again on July 15, 2011 and September 15, 2012.

20  She prepared an updated Psychosexual and Risk Assessment which should have been dated

21  September 17, 2012.  In the updated report she states, "[c]onsidering that Mr. Gonzalez has no

22  prior hand-on or hands-off sex offense arrest or conviction, does not self-report prior hands-on

23  sex offending behavior and has no prior criminal record, his risk for hands-on sex offenses, as

24  well as for recidivism with child pornography is low" and "When considering both the SVR-20

25  and research specific to online sex offenders, Mr. Gonzalez fell into risk categories that suggest

26  he can be safely supervised and treated in the community." See Exhibit 4, page 16.

27      Dr. Mahaffey opines that Mr. Gonzalez is amenable to treatment and is in need of a

28  combination of mental health and sex offender treatment.  See Exhibit 4, page 16.

In both reports Dr. Mahaffey Diagnostic Impression in part was that: Axis I (Clinical Disorder) Mr. Gonzalez suffers from Schizoaffective Disorder, Depressive Type, Adjustment Disorder with Anxiety, Sexual Disorder; Axis IV (Psychological and Environmental Stressors) history of childhood emotional, physical and sexual abuse; and Axis V (Global Assessment of Functioning) severe impairment in functioning.  See Exhibit 3, page 10 and Exhibit 4, page 12.

Mr. Gonzalez was raised by his mother,                and his step-father,                          is mentally ill having treated both at Northern Nevada Adult Mental Health Services and with private psychologists for several years.  The identity of Mr. Gonzalez's biological father is unknown.

Cathy Spatz Widom, a professor of criminal justice and psychology at the State University of New York at Albany has published a series of reports on behalf of the National Institute of Justice about the consequences of abuse suffered by children.[2]  In one of her reports, Dr. Widom recognizes that the "link between early childhood sexual abuse and later development in adult criminal behavior is not inevitable," and that the majority of children involved in her study that were sexually abused did "not have an official history as adults."[3] Nonetheless, she reports that as a whole, victims of sexual abuse suffered the same sort of consequences as those who suffer from other forms of childhood abuse.  *Id.*  Those consequences include lower IQ scores, a reduced likelihood of completing high school, a greater likelihood of holding menial and semi-skilled jobs,   lower quality of inter-personal relationships, alcohol abuse, personality disorders, an increased chance of attempting suicide, and higher arrest rates.[4]

[2]The National Institute of Justice is "the research, the development, and evaluation agency of the U.S. Department of Justice."  www.nig/about/welcome.htm.  It publishes the National Institute of Justice Journal.

[3]Cathy Spatz Widom, *Victims of Child Sexual Abuse-Later Criminal Consequences,* National Institute of Justice Research Brief 7 (March 1995) found at www.ncirs.gov/pdffiles/abuse.pdf

[4]Cathy Spatz Widom, *Childhood Victimization: Early Adversity, Later Psycho Pathology,* National Institute of Justice Journal 4-5 (2000) found at www.ncirs.gov/pdffiles/jr000242b.pdf, *See also: Another Look at the Effects of Child Abuse,* National Institute of Justice Journal 23 (July 2004) found at www.ncjrs.gov/pdffiles1/jr000251g.pdf

ATTORNEYS AND
COUNSELORS AT LAW
Office: (775) 348-9999 Fax: (775) 348-0540
P. O. BOX 3677 ~ RENO, NEVADA 89505
327 CALIFORNIA AVENUE ~ RENO, NEVADA 89519

FAHRENDORF,
VILORIA,
OLIPHANT
& OSTER, L.L.P.

1    Courts have also recognized the long lasting effects of abuse.  *See* <u>Santosky v. Kramer</u>,

2  455 U.S. 745, 789 (1982)(Rehnquist, J. dissenting) ("It requires no citation of authority to assert

3  that children who are abused in their youth generally face extraordinary problems developing

4  into responsible, productive citizens").  In a pre-Booker decision, the Second Circuit also

5  recognized the harm:

6    It seems beyond question that abuse suffered during childhood--at some level of
     severity--can impair a person's mental and emotional conditions. *See* <u>Roe</u>, 976
7    F.2d at 1218 (stating that "victims of [child] abuse frequently experience
     profound feelings of inadequacy, isolation, confusion, low self-esteem, and guilt"
8    and that "each of these effects constitutes either a mental or emotional
     condition"); <u>Vela</u>, 927 F.2d at 199  (recognizing that "[a] defendant's family
9    history of incest or related treatment" can "cause[] [the] defendant to incur a
     mental or emotional condition that affects criminal conduct").

10

11  <u>United States v. Rivera</u>, 192 F.3d 81, 84 (2d Cir. 1999).

12    The factors to be considered by a court at sentencing are by now well established.  *See* 18

13  U.S.C. § 3553(a); <u>United States v. Gonzalez</u>, 550 F.3d 1319, 1324 (11th Cir. 2008).  In Mr.

14  Gonzalez's case, it is his unique personal circumstance that sets his case apart from many others.

15  As Justice O'Connor recognized in her concurring opinion in <u>California v. Brown</u>, 479 U.S. 538,

16  545 (1987), "evidence about the defendant's background and character is relevant because of the

17  belief, long held by this society, that defendants who commit criminal acts that are attributable to

18  a disadvantaged background, or to emotional and mental problems, may be less culpable than

19  defendants who have no such excuse."  *See also*, <u>Porter v. McCollum</u>, 130 S. Ct. 447, 454

20  (2009).

21    Mr. Gonzalez's current circumstances are the product of the abuse that began when he

22  was five years old.  To ignore that circumstance and sentence him as a wholly intact person

23  would be to ignore the longstanding tradition that sentencing courts have of considering the

24  person before them as an individual.  *See* <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996) ("it has

25  been uniform and constant in the federal judicial tradition for the sentencing judge to consider

26  every convicted person as an individual and every case as a unique study in the human failings

27  that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").  The

28  human failing, here, is Mr. Gonzalez's, but it is also that of his mother, his uncle and a family

ATTORNEYS AND
COUNSELORS AT LAW
Office: (775) 348-9999 Fax: (775) 348-0540
P. O. BOX 3677 ~ RENO, NEVADA 89505
327 CALIFORNIA AVENUE ~ RENO, NEVADA 89519

FAHRENDORF,
VILORIA,
OLIPHANT
& OSTER L.L.P.

1  setting that allowed the abuse to occur.  Mr.Gonzalez requests the Court consider his mental

2  health, the reasons for the same, and his need for treatment and asks the Court to impose a

3  sentence less than the 97 months recommended by the Probation Department.

4      Imprisoning someone like Mr. Gonzalez for eight years would be a great injustice.  As

5  the Supreme Court has noted, "a sentence of imprisonment may work to promote not respect, but

6  derision of the law, if the law is viewed as merely a means to dispense harsh punishment without

7  taking into account the real conduct and circumstances involved in sentencing." <u>Gall v. United</u>

8  <u>States</u>, 552 U.S. 38, 54, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).

9      A downward departure and/or variance with a sentence of 60 months is appropriate.

10  DATED this _2 4th_ day of October, 2012.

11

12

13                                        THOMAS E. VILORIA
                                         FAHRENDORF, VILORIA,
14                                           OLIPHANT & OSTER L.L.P.
                                         Counsel for DAVID GONZALEZ

ATTORNEYS AND
COUNSELORS AT LAW
Office: (775) 348-9999  Fax: (775) 348-0540
P. O. BOX 3677 ~ RENO, NEVADA 89505
327 CALIFORNIA AVENUE ~ RENO, NEVADA 89519

FAHRENDORF,
VILORIA,
OLIPHANT
& OSTER L.L.P.

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of the law firm of Fahrendorf, Viloria, Oliphant & Oster LLP, and that on the _____25th_____ day of October, 2012, I caused to be served via electronically the Defendant's Sentencing Memorandum to the following party:

>United States Attorney's Office
>100 W. Liberty St., Suite 600
>Reno, NV 89501

_Marianne Kiley_
Marianne Kiley

1

## <u>INDEX OF EXHIBITS</u>

2

| EXHIBIT NO. | DESCRIPTION | NO. PAGES |
|---|---|---|
| Exhibit 1 | Letter from Thomas E. Viloria, Defense Counsel, to the US Probation Office dated September 26, 2612, outlining Defendant's Objections. | 3 |
| Exhibit 2 | Vita of Martha B. Mahaffey, Ph.D. | 8 |
| Exhibit 3 | Psychosexual and Risk Assessment of Martha B. Mahaffey, Ph.D. dated May 13, 2011 | 14 |
| Exhibit 4 | Psychosexual and Risk Assessment – Updated – of Martha B. Mahaffey, Ph.D. dated September 17, 2011 | 17 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTORNEYS AND
COUNSELORS AT LAW
Office: (775) 348-9999 Fax: (775) 348-0540
P. O. Box 3677 ~ Reno, Nevada 89505
327 California Avenue ~ Reno, Nevada 89519

FAHRENDORF,
VILORIA,
OLIPHANT
& OSTER, L.L.P.

# EXHIBIT 1

# EXHIBIT 1

Robert P. Fahrendorf
Thomas E. Viloria*
R. Shawn Oliphant
Raymond E. Oster
Nathan J. Aman

Roger S. Doyle*
Patrick R. Millsap
*Also Admitted in CA

# FAHRENDORF,
# VILORIA,
# OLIPHANT
# & OSTER LLP.

ATTORNEYS
AND
COUNSELORS
AT LAW

Office: 775-348-9999
Fax:     775-348-0540
www.renonvlaw.com

Proud Supporter of:



September 26, 2012

*Hand Delivered and*
*Email chris_dericco@nvp.uscourts.gov*
Mr. Christopher P. DeRicco
United States Probation Office
400 S. Virginia St. Room 103
Reno, NV 89501-2149

Re:   United States of America v. David Gonzalez
      Presentence Investigation Report
      Case No.: 3:11-CR-00055-HDM-WGC
      Defendant's Objections to Presentence Report

Dear Mr. DeRicco:

Mr. Gonzalez' objections to the Presentence Report are as follows:

## PART A. THE OFFENSE

Offense Level Computations

30. **Specific Offense Characteristic:** The offense level must be increased by two levels as the offense involved the use of a computer or interactive computer service for the possession, transmission, receipt, or distribution of the material. U.S.S.G. §2G2.2(b)(6).

This two level increase should be removed because it applies to virtually every defendant who uses a computer and the internet to receive child pornography photographs/videos. Also, there is no justification for distinguishing between receipt of computer stored photographs and/or videos and receipt of the same on paper, discs, tapes, DVD's or other media. As stated in *United States v. Dorvee*, 616 F.3d 174,187 (2nd Cir. 2010). The two level increase for "the use of a computer or interactive computer service for the possession, transmission, receipt, or distribution of the material" is arbitrary and does not distinguish between defendants like Mr. Gonzalez and the sentence for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and fall in higher criminal categories.

As stated in *Dorvee,* many of the changes directed by Congress were openly opposed by the Sentencing Commission:

431673

P.O. BOX 3677       RENO, NEVADA 89505        327 CALIFORNIA AVENUE       RENO, NEVADA 89509

September 26, 2012
Christopher P. DeRicco
U.S. Probation Office
Page 2

The Commission has often openly opposed these congressionally directed changes.  For instance, the Commission criticized the two-level computer enhancement on the ground that it fails to distinguish serious commercial distributors from run of the mill users.  *Id.* at 185.

In the final analysis, the court in *Dorvee* concluded that the within-guideline sentence was substantively unreasonable.

Accordingly, we request the Total Offense Level should be adjusted to 28 under Offense Level Computations.

## PART B. OFFENDER CHARACTERISTICS

Mental and Emotional Health

Dr. Mahaffey evaluated Mr. Gonzalez on April 26, 2011 and again on May 2, 2011 to determine his competency to stand trial and prepared a report dated May 5, 2011.  On page 6 of her report she opines, "David Gonzalez presented as marginally competent to stand trial.  He suffers from a mental disease or defect, specifically Schizophrenia vs. Schizoaffective Disorder, depressive type.... [w]ith his improved mental state, Mr. Gonzalez could be safely managed in the community as he awaits trial.  However, he should immediately be reconnected with Northern Nevada adult mental health services for medication management and supportive counseling to assist him with the stresses legal proceedings.  Absent such management and support, there is concern that he may decompensate."

On July 15, 2011 Dr. Mahaffey conducted a second evaluation to determine if Mr. Gonzalez was competent to stand trial.  Dr. Mahaffey prepared a report dated July 15, 2011.  On page 2 of the report she concludes, "Mr. Gonzalez is not competent to stand trial. He suffers from schizophrenia versus schizoaffective disorder, depressive type.  He is expressing acute paranoid delusions, auditory, visual, and tactile hallucinations, command hallucinations to harm himself and others, is engaging in self-mutilation and head-banging, and presents a danger to himself and potentially to others. In his present psychotic state, he is unable to understand the nature and consequences of the proceedings against him and to assist properly in his defense. Transfer to a forensic psychiatric facility is recommended for treatment to competency.

As you are aware, by order dated July 21, 2011, the Hon. Robert A. McQuaid, Jr., requested an evaluation of David Gonzalez for present competency to stand trial, pursuant to 18 U.S.C. § 4241.  In that regard, Dr. Ralph Ihle of the US Department of Justice authored a Forensic Evaluation dated October 14, 2011.  On page 17 of his report he opines: "based on the information available, there is objective evidence to indicate that Mr. Gonzalez does suffer from a mental disorder that significantly impairs his present ability to understand the nature and consequences of the court proceedings against him, or his ability to properly assist counsel in his defense... he is clearly not able to ascertain reality, realistically appraise his behavior, or consistently converse in a logical and coherent manner, all of which would be necessary to some extent to properly assist counsel in the defense.  Hence, it is recommended that Mr. Gonzalez be committed to a federal medical center for treatment for restoration to competency pursuant to 18 U.S.C. § 4241 (d)."

September 26, 2012
Christopher P. DeRicco
U.S. Probation Office
Page 3

On September 15, 2012, Dr. Mahaffey conducted an additional evaluation of Mr. Gonzalez and prepared a report dated September 17, 2011.  The report should be correctly dated September 17, 2012 and is titled Psychosexual and Risk Assessment-Updated.  A copy of this report is enclosed herein.  On page 16, Dr. Mahaffey notes, "[c]onsidering that Mr. Gonzalez has no prior hands-on or hands-off sex offense arrest or conviction, does not self-report prior hands-on sex offending behavior, and has no prior criminal record, his risk for hands-on sex offenses, as well as for recidivism with child pornography is low."  She further opines that, "[w]hen considering both the SVR-20 and research specific to online sex offenders, Mr. Gonzalez fell into risk categories that suggest he can be safely supervised and treated in the community.  This report was not received by me until September 17, 2012 and a copy has been provided to Ms. Higginbotham.

Please at a minimum, include the above information within the sub-heading PART C. OFFENDER CHARACTERISTICS Mental and Emotional Health.  Each of the referenced reports are contained within the United States Attorney's file.  All of this material information has been omitted from the Presentence Report.  If you need a copy of any report, please advise me.

## PART F. VARIANCES THAT MAY BE CONSIDERED IN IMPOSING SENTENCE

91. The Probation Officer has not identified any factors under 18 U.S.C. § 3553(a) that may warrant a variance and imposition of a non-guideline sentence.  This assertion is not accurate.

Please include the following:

Mr. Gonzalez has no criminal history.  18 U.S.C. § 3553(a)(1);

Mr. Gonzalez was mentally and physically abused by his mother.  18 U.S.C. § 3553(a)(1);

Mr. Gonzalez was sexually abused by          from the ages of 7 to 12.  18 U.S.C. § 3553(a)(1); and

Mr. Gonzalez since the age of 18 has suffered from mental illness to include at times: depression, bipolar disorder, anxiety, Schizophrenia, Schizoaffective Disorder.  18 U.S.C. § 3553(a)(1);

Sincerely yours,

FAHRENDORF, VILORIA,
OLIPHANT & ØSTER L.L.P.

Thomas E. Viloria, Esq.

TEV: mk
Enclosure

EXHIBIT 2

EXHIBIT 2

# VITA

## MARTHA B. MAHAFFEY, Ph.D.

**Address:** 834 Willow St., Reno, Nevada  89502
**Phone:** (775) 323-6766
**FAX:** (775) 323-2716

**Ethnic Status:** Hispanic
**Languages:** Spanish and English fluently spoken, written, and read

## EDUCATION

| | | |
|---|---|---|
| 7/80-12/86 | University of Nevada, Reno<br>Reno, Nevada<br>Doctorate, Clinical Psychology | 9/76-6/77   College of San Mateo<br>San Mateo, California |
| 9/77-6/80 | Santa Clara University<br>Santa Clara, California<br>Bachelor of Science, Psychology | |

## CREDENTIALS

1988 to Pres   Nevada License #190
1999 to Pres   Diplomate in Forensic Psychology, American Board of Psychological Specialties
2004 to Pres   Certification as Evaluator for Competency to Stand Trial, State of Nevada

## CLINICAL EXPERIENCE

11/96 to Pres   ***Clinical Psychologist***, *Private Practice, Reno, Nevada.*
4/87-12/89   ***Clinical Psychologist and Psychological Associate***, *Private Practice, Reno, Nevada.*

*Forensic Evaluations*
- Criminal [competency, criminal responsibility, exculpatory and mitigating defenses, death penalty mitigation, death penalty and mental retardation, psychosexual and risk assessment, other risk assessment (violence, child abuse, domestic violence, stalking), substance abuse, Miranda Rights, post-conviction, sentencing]
- Civil (immigration issues, workman's compensation, independent medical evaluations, personal injury, wrongful death, wrongful termination, discrimination, sexual harassment)
- Child custody; parental capacity; juvenile proceedings

*Consultation to Community Organizations*
- Washoe County Public Defender
- Nevada State Public Defender
- Federal Public Defender, District of Nevada
- Special Public Defender, Clark County
- Alternate Public Defender, Washoe County
- Clark County District Attorney
- Washoe County District Attorney
- Humboldt County District Attorney
- Lyon County District Attorney
- Elko County District Attorney
- Douglas County District Attorney
- Division of Parole and Probation

- Washoe County Juvenile Services
- Nevada Youth Parole
- Washoe County Social Services
- Division of Child and Family Services
- Bureau of Disability Adjudication
- Bureau of Vocational Rehabilitation
- Sierra & Rural Regional Centers
- State of Nevada Board of Psychology
- State of Nevada Board of Nursing
- State of Nevada Board of Social Work
- Nevada System of Higher Education-UNR
- State of Oregon Dept. of Human Services

*Other Psychological Evaluations:*  Psychological disability; mental retardation; learning disability; attention-deficit and hyperactivity disorder; fitness for duty; impaired provider; workplace violence; neurocognitive impairment; and general psychological evaluations

*Psychotherapy* of English and Spanish-speaking individuals, couples, and families

VITA – MARTHA B. MAHAFFEY, Ph.D.
Page 2

| 2/88-2/98 | *Staff Psychologist, V.A. Medical Center, Reno, Nevada.* |

      3/90-2/98  *Director of Training, Psychology Service*
- Administration of the APA accredited psychology predoctoral internship program and summer practicum program
- Administrative supervision of training staff
- Coordination with psychiatry residency program and social work internship program
- Acting Chief, Psychology Service, as needed

      2/88-2/98  *Psychologist, Day Treatment Center*
- Consultation, psychotherapy, and assessment of chronic mentally ill adult outpatients and their families, including patients with psychotic disorders, affective disorders, personality disorders, dual psychiatric and substance abuse disorders, post traumatic stress disorders, and medical disorders
- Program and research development
- Quality assurance coordination
- Acting Coordinator, Day Treatment Center, as needed

      *Other responsibilities:*
- Chair, Mental Health Quality Assurance Committee
- Psychotherapy, conflict resolution, and personnel consultation for Nursing Service, Employee Assistance Program
- Compensation and pension disability evaluations

10/87-2/88    *Staff Psychologist, Nevada Mental Health Institute, State of Nevada, Reno, Nevada*
- *Intensive Care and Intercare Psychiatric Inpatient Units.*  Consultation, psychotherapy, and assessment of acutely and chronically disturbed adult inpatients
- *Geriatric Inpatient Unit.*  Geropsychiatric program development and consultation.
- *Continuing Care and Outpatient Services.*  Program analysis.

9/85-11/85   *Counselor, Drug and Alcohol Rehabilitation Unit, V.A. Medical Center, Menlo Park, California.*
- Coordination of evening inpatient detoxification program and psychotherapy

9/84-8/85    *Psychology Intern, V.A. Medical Center, Palo Alto, California (APA accredited)*
- *Family Program.*  Couples and family therapy, sex therapy
- *Medical Psychology Program.*  Consultation, psychotherapy, and assessment to outpatient medical psychology program, oncology clinic, and general medicine and surgery units
- *Psychiatric Intensive Care Unit.*  Psychotherapy and forensic evaluation of adults in acute psychological crisis manifested by extreme psychosis, self-destructive and assaultive behavior
- *Psychological Assessment Unit.*  Psychological testing and neuropsychological screening to general outpatient and inpatient units

9/83-6/84    *School Consultant and Counselor, Storey County School District, Virginia City, Nev.*
- Consultation to principals, teachers, special education instructors, and parents regarding elementary, junior, and senior high school students
- Psychotherapy and behavioral assessment of children and adolescents

VITA -- MARTHA B. MAHAFFEY, Ph.D.
Page 3

7/82-1/83    **Psychology Intern,** *Carson Mental Health Center, Carson City, Nevada*
- Development of Spanish-speaking therapy program; consultation to community agencies; and psychotherapy and assessment of adults, adolescents, and children

9/80-6/82    **Psychology Trainee,** *Psychological Services Center and Children's Behavioral Services, University of Nevada, Reno.*
- Psychotherapy and assessment of adults, adolescents, and children.

6/80-7/80    **Research Trainee,** *V. A. Medical Center, Reno, Nevada*
- Neuropsychological research

9/79-12/79   **Psychology Trainee,** *Children's Health Council, Palo Alto, California*
- Formulation and implementation of academic/behavioral treatment plans for children with emotional, learning, language, neurological, and/or mental disabilities

**TEACHING EXPERIENCE**

2/98-7/05    **Instructor,** *Psychology Internship, V.A. Medical Center, Reno, Nevada*
2/88-2/98    **Supervisor and Instructor,** *Psychology Internship and Psychiatry Residency, V. A. Medical Center, Reno, Nevada*
11/87-6/00   **Adjunct Professor,** *Department of Psychology, University of Nevada, Reno*
12/94-6/98   **Clinical Professor,** *Department of Psychiatry and Behavioral Sciences, University of Nevada School of Medicine*
2/88-12/94   **Assistant Professor,** *Department of Psychiatry and Behavioral Sciences, University of Nevada School of Medicine*
9/87-12/87   **Instructor,** *Department of Arts and Sciences, Truckee Meadows Community College, Reno, Nevada*
7/83-8/83    **Instructor,** *Department of Psychology, University of Nevada, Reno*

**OTHER PROFESSIONAL EXPERIENCE**

2002-Pres    **Examination Commissioner,** *State of NV Board of Psychological Examiners*
2005         **Consultant,** *Child Custody Evaluations, State of NV Board of Psychological Examiners*
1992-2002    **Examiner,** *State of NV Board of Psychological Examiners*
2002         **Grant Consultant,** *NIMH grant, Parent-Child Attachment Tool for Child Custody*
1996-2002    **Site Visitor,** *Committee on Accreditation, American Psychological Association*
5/95         **Temporary Board Member,** *State of NV Board of Psychological Examiners, Governor appointed*
9/82-6/83    **Member,** *Social and Behavioral Sciences Human Subjects Review Committee, University of Nevada, Reno*

**PUBLICATIONS, PRESENTATIONS, AND RESEARCH**

Mahaffey, M.B. (Jan 2010; July 2010; Jan 2011; July 2011; Jan 2012; June 2012). State of Nevada Board of Psychological Examiners State Examination for Licensure: Candidate Guide.

Mahaffey, M.B. (2012). Overview of the psychology licensure examination process. Silver State Psychology News.

Mahaffey, M.B. (2010). New state examination for psychology licensure: A successful launch. Silver State Psychology News.

Mahaffey, M.B. (2005). A glimpse into the Nevada psychology oral examination. Silver State Psychology News.

VITA – MARTHA B. MAHAFFEY, Ph.D.
Page 4

Mahaffey, M. B. (2003). Issues of ethnicity in forensic psychology: A model for Hispanics in the United States. In W. O'Donohue and E. Levensky (Eds.), Handbook of forensic psychology. San Diego, CA: Elsevier Academic Press.

Mahaffey, M. B. (1998). Graduation within a psychiatric Day Treatment Center: Addressing managed care. V.A. Medical Center, Reno, Nevada.

Mahaffey, M. B., Batten, S. V., & Sheldon-Brown, T. (1996). Screening and retention in a psychiatric Day Treatment Center. V.A. Medical Center, Reno, Nevada.

Mahaffey, M. B., Zappe, C., Sheldon-Brown, T., & Batten, S. V. (1996). Day Treatment Center: Program development and patient characteristics. V.A. Medical Center, Reno, Nevada.

Mahaffey, M. B., Zappe, C., & Sheldon-Brown, T. (1994, April). Day Treatment Center: The first five years. Paper presented at the annual meeting of the Western Psychological Association, Kona, Hawaii.

Follete, V., Tyler, J., Parson, M., Mahaffey, M., Phoenix, J., and Peer, A. (1992, September). Panel on diversity: Issues related to women, ethnic minority, and gay-lesbian populations and therapists. Presented at the Paul McReynolds Lecture, Reno, Nevada.

Antonuccio, C. O., Boutilier, L.R., Varble, D., & Mahaffey, M. B. (1991, July). Smoking cessation in the U.S. veteran population. Symposium presented at the meeting of the Inter-American Congress of Psychology San Jose, Costa Rica.

Mahaffey, M. B. (1990, August). Locus of control in Hispanic American adults. Paper presented at the meeting of the American Psychological Association, Boston, Massachusetts.

Mahaffey, M. B. (1989, April). Acculturation, generation level, and locus of control in Mexican Americans. Paper presented at the joint convention of the Western Psychological Association and Rocky Mountain Psychological Association, Reno, Nevada.

Mahaffey, M. B. (1987). Locus of control in Mexican, Central, and South American adults. (Doctoral Dissertation, University of Nevada, Reno, 1986). Dissertation Abstracts International, 47, 12.

Mahaffey, M. B. (1985). Abusive relationships: A comparison of battered and exbattered women. Reno, NV: University of Nevada, Reno (ERIC Document Reproduction Services No. ED 250 638).

Mahaffey, M. B. (1984, April). Abusive relationships: A comparison of battered and exbattered women. Paper presented at meeting of the Rocky Mountain Psychological Association, Las Vegas, NV.

Mahaffey, M. B. (1980, May). Causal attributions in sex-linked occupations as a function of sex and age. Paper presented at meeting of the Western Undergraduate Psychology Conference, Santa Clara, CA.

## HONORS AND AWARDS

Grants-in-Aid of Research, Sigma Xi, Scientific Research Society
Psi Chi, National Honor Society in Psychology, UNR
National Institute of Mental Health Training Grant, UNR
Senior Psychology Award Outstanding Academic Achievement, SCU

Magna Cum Laude, SCU
Phi Beta Kappa, SCU
Sigma Xi, Scientific Research Society, SCU

## PROFESSIONAL AFFILIATIONS

American Psychological Association
Nevada Psychological Association

American Board of Psychological Specialties

VITA – MARTHA B. MAHAFFEY, Ph.D.
Page 5

## FORENSIC EXPERIENCE

## CASES INVOLVING EXPERT WITNESS TESTIMONY = 60

State of Nevada vs. Quinton Boyles, Sixth Judicial District Court, Humboldt County, Nevada, CR11-6029,
    Domestic Violence and Risk Assessment, 2012

State of Nevada vs. James Matlean, Ninth Judicial District Court, Douglas County, Nevada, 10-CR-0145,
    Murder, 2012

State of Nevada vs. Victor Orlando Cruz Garcia, Eighth Judicial District Court, Clark County, Nevada,
    08C240509, Capital Murder, Mental Retardation and Criminal Responsibility (NGRI), 2012

State of California vs. Charles Benbow, Superior Court of California, Plumas County, F11-00046, Psychosexual
    and Risk Assessment, 2011

Bryson Lokken vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, CR06P1923, Post
    Conviction: Psychosexual and Risk Assessment, 2011

David Newell vs. April Newell, Second Judicial District Court, Washoe County, Nevada, DV07-00426, Child
    Custody, 2011

Hamid Hashemi vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, CR03P0373,
    Post Conviction: Psychosexual and Risk Assessment, 2011

Santiago Moreno vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, CR08P0989 &
    CR08P0974, Post Conviction: Psychological and Neuropsychological Evaluation, 2011

Jerry Selbach vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, CR06P-2828,
    Post Conviction: Sex Offense, Psychosexual and Risk Assessment, 2009

Jorge Pena vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, CR05P-2451,
    Post Conviction: Sex Offense, Psychosexual and Risk Assessment, 2008

Carrie A. Bryan vs. Clinton G. Bryan, Second Judicial District Court, Washoe County, Nevada, DV07-01764,
    Child Custody, 2008

State of Nevada vs. Ubaldo Urbina-Maldonado, Second Judicial District Court, Washoe County, Nevada,
    CR06-2098, Understanding of Miranda Rights, 2007 and 2008

State of Nevada vs. Foster Gordon, Second Judicial District Court, Washoe County, Nevada, CR06-0416,
    Sex Offense, Competency to Testify and Mental Retardation, 2007

State of Nevada vs. Willie Herman, Second Judicial District Court, Washoe County, Nevada, CR02-1181,
    Murder, Violence Risk Assessment, 2007

Jay McGrath vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, CR05P-1861, Post
    Conviction: Assault with Deadly Weapon, Psychological Evaluation & Battered Person Syndrome, 2007

Michael Botelho vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, CR03P2156,
    Post Conviction: Sex Offense, Psychosexual and Risk Assessment, 2007

Alicia Sullivan vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, CR01P-2045B,
    Post Conviction: Robbery, Mental State at the Time of the Offense, 2006

Tiffany Basa vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, Post Conviction:
    Child Neglect/Endangerment Resulting in Substantial Bodily Harm, Psychological Evaluation and
    Battered Person Syndrome, 2006

State of Nevada vs. Jimmy Todd Kirksey, Eighth Judicial District Court, Clark County, Nevada, C87945,
    Capital Murder, Mental Retardation, 2006

In the matter of Micah David Leval, Juvenile Division, First Judicial District Court, Carson City, Nevada,
    01-10033J, Sex Offense, Psychosexual and Risk Assessment, 2005

State of Nevada vs. Arnold Preston Bertnick, Second Judicial District Court, Washoe County, Nevada,
    CR02-0467, Child Abuse Causing Death, 2005

Jason Hamel vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, CR03P-1236,
    Battery Causing Substantial Bodily Harm, Psychological and Substance Abuse Evaluation, 2005

Raymond Rosas vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada, CR99P1843B,
    Post Conviction: Murder, Psychological Evaluation, 2004

Jose Escobedo-Guevarra vs. State of Nevada, Second Judicial District Court, Washoe County, Nevada,
    CR00-0990, Post Conviction: Sex Offense, Psychosexual and Risk Assessment, 2004 (2 x)

VITA – MARTHA B. MAHAFFEY, Ph.D.
Page 6

State of Nevada vs. Vornelius Phillips, Eighth Judicial District Court, Clark County, Nevada, C175468,
    Capital Murder, Mental Retardation, 2003

State of Nevada vs. Maria Alvarado, Second Judicial District Court, Washoe County, Nevada, CR01-2358,
    Child Abuse, Risk Assessment, 2003

United States of America vs. Sheryl Jean Clark, United States District Court, District of Nevada,
    CR-N-02-165-HDM (VPC), Bank Robbery, Psychological Evaluation, 2003

United States of America vs. Alan William Stokvis, United States District Court for the District of Nevada,
    CR-N-02-115-DWH (RAM), Bank Robbery, Psychological Evaluation, 2003

Fred Money II vs. Heather Money, Lassen County Superior Court, California, 30603, Child Custody, 2002

State of California vs. Ronald Dennis Blamey, Nevada County Superior Court, California, CV01-01930,
    Murder, Psychological and Risk Assessment, 2001

State of Nevada vs. Orlando Vallejos, Third Judicial District Court, Lyon County, Nevada, CR5394,
    Sex Offense, 2001

State of Nevada vs. Melissa Harney, Second Judicial District Court, Washoe County, Nevada, CR99-2232,
    Murder, Psychological Evaluation, 2000

State of Nevada vs. Anthony Barela, Second Judicial District Court, Washoe County, Nevada, CR98-2926,
    Attempted Murder, Psychological and Risk Assessment, 2000

State of Nevada vs. Mary Rivinius, Second Judicial District Court, Washoe County, Nevada, CR99-1645,
    Child Abuse, Psychological and Risk Assessment, 1999

State of Nevada vs. Latisha Marie Babb, Weston Edward Sirex, and Shawn Russell Harte, Second Judicial
    District Court, Washoe County, Nevada, Capital Murder, Psychological Evaluation, 1999

Deborah Zellisse vs. Thomas Miller, Second Judicial District Court, Washoe County, Nevada, DV95-02342,
    Child Custody, 1999

Walter Haynie vs. Bonnie Clark, Second Judicial District Court, Washoe County, Nevada, DV90-1831,
    Child Custody, 1997

State of Nevada vs. Mario Sotelo Reyes, Second Judicial District Court, Washoe County, Nevada,
    CR96-0704, Attempted Murder, Psychological Evaluation, 1996

State of Nevada v. Arthur Haviland, Sixth Judicial District Court, Humboldt County, NV, Sex Offense, 1989


Immigration Cases, Bureau of Immigrations and Customs Enforcement, Department of Homeland Security,
    Reno, Nevada
        In the matter of Graciela Godinez, 2002
        In the matter of Camarena Sanchez, 1999
        In the matter of Andrade Hernandez, 1999
        In the matter of Benjamin Garcia and Mirna Garcia, 1998
        In the matter of Martin Torres and Maria Murillo, 1998
        In the matter of Ricardo Barajas, 1998
        In the matter of Rosio Lopez and Alejandro Garcia, 1998
        In the matter of Maria Arceo, 1998
        In the matter of Guadalupe Rojas, 1998
        In the matter of Leocadeo Bustos, 1998
        In the matter of Manuel Puga, 1998
        In the matter of Dagoberto Rodriguez, 1998
        In the matter of Ruben Gonzales, 1998
        In the matter of Samuel Borgarin, 1998
        In the matter of Maurino Pastelin Fierro, 1998
        In the matter of Juan Gonzalez, 1998
        In the matter of Alfredo Gonzalez, 1998
        In the matter of Jose Lopez, 1998

VITA – MARTHA B. MAHAFFEY, Ph.D.
Page 7

## CASES INVOLVING EXPERT WITNESS DEPOSITION = 7

Jane Doe and John Doe vs. Summerlin Medical Center, L.P.; Universal Health Services, Inc.; UHS Holding
      Company, Inc.; Roy Alan O'Guinn; and Does I through X, inclusive, Eighth Judicial District Court,
      Clark County, Nevada, A411913, Personal Injury, 2003
Jesus Mendoza vs. Stanley Fail, Jr., and Does I-X, United States District Court, District of Nevada,
      CV-N-02-0289-HDM-RAM, Personal Injury, 2002
Mary M. Bradley and Terry Lee Bradley, Jr., vs. H.M. Byars Construction, et al., Second Judicial District
      Court, Washoe County, Nevada, CV00-03024, Personal Injury and Wrongful Death, 2002
Stephen Fellows, Patricia Fellow vs. Suburban Propane, L.P., Robert Coleman, Alison Coleman, and Does
      to 20, Inclusive, SCB8679 (SCV9035, TCV 000405), Placer County Superior Court, California,
      Personal Injury, 2001
John E. Goodwill vs. Carolin Goodwill, Second Judicial District Court, Washoe County, Nevada,
      DV99-00598, Child Custody, 1999
Magdalena Zelaya vs. Eastern & Western Hotel Corporation, U.S. District Court, Las Vegas, Nevada,
      CV-S-96-00989-DWH (RLH), Sexual Harassment and Wrongful Termination, 1997
Eduardo H. Uribe vs. Marvin Dean Rubin, et al., Ninth Judicial District Court, Douglas County, Nevada,
      Personal Injury, 1989

## FORENSIC EVALUATIONS / CONSULTATIONS, 1996 TO PRESENT = 1000

### Civil Cases

| | |
|---|---|
| Sexual Harassment, Discrimination, Wrongful Termination | 3 |
| Personal Injury, Workman's Compensation | 15 |
| Civil Competency | 1 |
| Civil Commitment | 1 |

### Immigration Cases

| | |
|---|---|
| Cancellation of Removal / Other | 41 |

### Family Court Cases

| | |
|---|---|
| Child Custody Evaluations | 28 |
| Parental Capacity | 22 |
| Psychological Evaluation | 2 |

### Criminal Cases

| | |
|---|---|
| Capital Murder | 11 |
| Murder/Attempted Murder/Manslaughter | 30 |
| Competency to Stand Trial | 215 |
| Competency to Testify | 3 |
| Psychosexual and Risk Assessment | 313 |
| Other Risk Assessments (violence, child abuse, domestic violence) | 77 |
| General Sentencing Evaluations | 75 |
| Post Conviction | 16 |

| | |
|---|---|
| Criminal Responsibility | 5 |
| Substance Abuse Evaluations | 11 |
| Comprehension of Miranda Rights | 4 |
| Juvenile Sentencing Evaluations | 90 |
| Juvenile Psychosexual Evaluations | 7 |
| Juvenile Certification for Trial as an Adult | 7 |
| Juvenile Competency to Stand Trial | 17 |
| Child Abuse/Neglect | 2 |

## OTHER EVALUATIONS, 1996 TO PRESENT = 375

| | |
|---|---|
| Fitness for Duty / Impaired Provider | 13 |
| Workplace Violence Risk Assessment | 3 |
| Mental Retardation | 73 |
| Disability | 262 |
| Vocational Rehabilitation | 13 |

VITA – MARTHA B. MAHAFFEY, Ph.D.
Page 8

**COURTS INVOLVING TESTIMONY, DEPOSITION, EVALUATIONS, CONSULTATIONS, REPORTS**

United States District Court, District of Nevada
Bureau of Immigrations and Customs Enforcement,
   Department of Justice, Nevada
First Judicial District Court, Carson City and Storey
   County, Nevada
Second Judicial District Court, Washoe County, Nevada
Third Judicial District Court, Lyon County, Nevada
Fourth Judicial District Court, Elko County, Nevada
Sixth Judicial District Court, Humboldt County, Nevada
Eighth Judicial District Court, Clark County, Nevada
Ninth Judicial District Court, Douglas County, Nevada

Reno Justice Court, Nevada
Sparks Justice Court, Nevada
Elko Justice Court, Nevada
Superior Court of California, Nevada County
Superior Court of California, Placer County
Superior Court of California, Eldorado County
Superior Court of California, Lassen County
Superior Court of California, Plumas County
Multnomah County District Court, Gresham,
   Oregon

Revised 6/8/2012

EXHIBIT 3

EXHIBIT 3

# Martha B. Mahaffey, Ph.D.

Clinical Psychologist, Nevada License #190

834 Willow St.
Reno, NV 89502

(775) 323-6766
FAX (775) 323-2716

## PSYCHOSEXUAL AND RISK ASSESSMENT

**Name: David Gonzalez**  
**Date of Birth:**                **Age: 25**  
**Placement: Washoe County Detention Center**

**Case No. 3-11-CR-00055-HDM-RAM**  
**Evaluation Date: April 26 & May 2, 2011**  
**Report Date: May 13, 2011**

### EVALUATION INSTRUMENTS
1. Clinical Interview, including psychosexual interview, 3.00 hrs.
2. Test of Nonverbal Intelligence – 3
3. Millon Clinical Multiaxial Inventory – III
4. HARE Psychopathy Checklist-Revised-2
5. Risk Assessment: Static-99 & Sexual Violence Risk-20
6. Review of discovery documents and psychoeducational records

**REASON FOR REFERRAL:** David Gonzalez was referred for psychosexual and risk assessment by defense attorney, Thomas Viloria, Esq. Mr. Gonzalez was charged with possession of child pornography for acts on or about April 6, 2011 involving knowingly possessing and knowingly accessing with the intent to view any matter that contains an image of child pornography that had been mailed, and shipped and transported in interstate and foreign commerce by any means, including by computer, and that was produced using materials that had been mailed, and shipped and transported in interstate and foreign commerce by any means, including by computer.

**DOCUMENT REVIEW** suggested that on February 28, 2011, a Federal Bureau of Investigation Innocent Images Task Force deputy marshal was conducting an undercover operation on the Gnutella –peer-to-peer file sharing network and identified an IP address having numerous child pornography files available. The service address of the IP address subscriber was identified. During a search of the residence on April 6, 2011, a forensic preview of David Gonzalez's HP laptop computer and external hard drive revealed several hundred images and videos of child pornography. These images contained depictions of prepubescent children engaging in sexually explicit conduct. In total, approximately 2000 images and videos were discovered on these electronic devices that were believed to contain child pornography. During interview, Mr. Gonzalez admitted that he intentionally downloaded images and videos of child pornography from the Internet using peer-to-peer file sharing software. Mr. Gonzalez also admitted that after downloading the images and videos he would store his child pornography on his computer and external hard drive. He admitted that he possessed at least a few hundred images of child pornography. Finally, Mr. Gonzalez admitted that he had been collecting child pornography for many years and he believed he would not be able to stop engaging in this conduct.

**MENTAL STATUS EXAMINATION:** David Gonzalez, a 25-year-old Mexican national, was cooperative and respectful throughout evaluation. Physical presentation was notable for mild rocking back and forth, with such less noticeable the second day of evaluation (May 5) as compared to the first day of evaluation (April 26). Affect or facial expression was serious or blunted. Mood was mildly anxious and depressed, potentially in response to his situational stressors, but absent a manic or elevated mood. He described his mood as, "Bad, every day I feel bad…. I hate being in

here. I feel anxious. I feel like running and hitting the doors. I hate being here." He described that during his first week of incarceration, he repeatedly punched and kicked the door and walls and a couple of times he hit himself in the chest. During the subsequent weeks, such behavior has subsided. He described a general restlessness that may have been reflective of anxiety and/or medication side effects.

On April 26 and May 5, Mr. Gonzalez denied suicide and homicide ideations, but he endorsed suicide ideations during the one month prior to his arrest, during which time he felt, "There is no point in living." When asked what he thinks may have precipitated such thoughts, he explained that he has had such thoughts most of his life: "Death was a big issue for me 'cause mom was always talking about it." During the one month prearrest, he thought of various ways he might kill himself, including hanging himself, crashing his car into a wall, cutting his wrist, and jumping off the Circus Circus parking lot. However, he described that such were thoughts absent actual intent. The day before he was arrested, he thought of writing a letter stating, "If I died that would be okay because I don't' want to live anymore."

David Gonzalez described that upon his arrest, he was consumed with a variety of emotions and told authorities that he always wanted to die, that if he died today he wouldn't care, and that although he wouldn't kill himself he wished he would be dead already. He denied that he expressed imminent suicide intent. He described that he told authorities that if he ever found a veterinarian in a dark alley, he would want to beat him for what he had done to his dog, but he knows he wouldn't do it and he wouldn't kill him. He denied that he expressed imminent intent to kill the veterinarian. The Internet Crimes against Children Task Force Investigative Report described,

> It should also be noted Gonzalez described a desire to kill himself and an unknown veterinarian he had contact with a few years ago. Gonzalez was angered towards him for what he believed was a lack of care for his dogs before they died. Gonzalez claimed to not be able to remember what animal clinic or the veterinarian's name, but he did state he had seen him out in public on a prior occasion.... I chose to place Gonzalez in custody, pending an initial appearance before a magistrate. When informing Gonzalez of my decision, Gonzalez explained he had thought about it and realizes he wouldn't really kill the veterinarian, but he would seriously beat him near death so he could remember him.

The Compliant noted:

> Throughout the course [of the] interview, Mr. Gonzalez repeatedly indicated that he was considering suicide. He also indicated that he had previously attempted suicide in the past by various means. He also indicated that he intended to kill an unnamed veterinarian that he blamed for killing his dogs. He noted that before he killed himself, he intended to kill the veterinarian.

On May 2, 2011, regarding thoughts about the veterinarian, he stated, "I think things fix themselves in life and eventually something will happen to him, but not by me. Life will catch up with him. I'm not going to pursue that anymore."

On April 26, 2011, Mr. Gonzalez described that he found a paperclip in his room and was playing tic-tac-toe on his arm by lightly scratching on his arm but not causing it to bleed. He described, "It is a little bit of pain so it helps. Enough to keep distracted." On May 2, 2011, Mr. Gonzalez described that he still had the paperclip but that had not scratched himself with it during the past week. For his safety, he was advised that this psychologist was going to disclose his scratching

with the paperclip to the correctional deputies so that he could surrender the paperclip to them for his safety. Although frustrated that I was not merely allowing him to throw it away, he surrendered the paperclip without incident. Deputies asked to see his arms and confirmed that he had no self-inflicted injuries. Mr. Gonzalez has a history of self-mutilation with a razor blade.

Thought process was focused. Thought content was absent delusions, hallucinations, or psychosis at the time of interview and he did not appear to be responding to internal stimuli. However, he described visual hallucinations during the first few days of incarceration and auditory hallucinations that continue to date but that are indiscernible and able to be ignored. Mr. Gonzalez described that initially, he was put in a small room and he had a difficult time being in such a confined space. During the first week, he repeatedly kicked and punched the walls and door. He described visual hallucinations that caused fear and concern that he was crazy: "I felt scared. I thought I was going crazy again." During his first few days in jail, he saw "something like a UFO stuck in the wall." When the nurse came in, he pointed to the wall, asked her what it was and expressed that he didn't know what it was. When he turned, the UFO was no longer there. The nurse did not see anything either. He also saw two cats -- one orange and one brown – he experienced one of the cats as walking upon him on the bed and rubbing his face against his face. When he pushed away the cat, nothing was there. When asked if he felt that such were real experiences or not, he described that at the time they felt very real but that since they disappeared he realizes that they were not real.

Review of jail medical records revealed that Mr. Gonzalez is prescribed the antipsychotic medicine Thorazine and Vistaril. Diagnostic impressions included *Mood Disorder Not Otherwise Specified, Anxiety Disorder Not Otherwise Specified, and History of Bipolar Disorder, Schizophrenia, and Depression.*

Pursuant to being prescribed medicine, Mr. Gonzalez has not had visual hallucinations and his thinking is clearer. He noted, "Without the medicine a million thoughts come into my head at once." He still hears voices, but they remain indiscernible and he is able to ignore them. The voices tend to appear when it is quiet and he is not focused upon something else. His new cell mate talks "nonstop," so such decreases the occurrence of the voices. At times they come to him when he is reading. Once during the two-hour interview on May 2 but not the two-hour interview on April 26, while this psychologist was writing, he stated, "See, right now I just heard something talk. It came in my ear and out the other really fast."

## DEFENDANT'S ACCOUNT OF OFFENSE AND RELATED ISSUES

**History of Sexual Abuse:** David Gonzalez described that when he was about 7 years old, _____ lived with his family. On an almost daily basis, _____ would tease him and tell him that he wanted to grab him and see his penis. On one occasion, _____ put his hand down David's pants and grabbed his penis. After that incident, _____ went to Mexico. When David was eight years old, _____ returned to live with his family. He resumed molesting David, fondling his penis on an almost weekly basis. When David once asked him why he did this, _____ told him that it was okay because he was young and _____ was older. On another occasion, _____ described that he did the same thing to his own children.

When David was 9 1/2 for 10 years old, he and his parents moved into their present home and _____ continued to live with them. The fondling continued but progressed to _____ telling him to take off all his clothes. Once, _____ took Polaroid pictures of him as he stood by the window naked. On another occasion, _____ digitally penetrated his anus and told David that he was now

3

"his." On several occasions,                asked him to lay in bed with him naked, but David refused. This sexual abuse continued until he was 12 years old. It ceased when .          moved to Mexico.

David was also sexually molested at age eight by a 15-year-old boy, who was                During a visit to Mexico, the two boys were sleeping together in the same bed. The older boy asked David to touch his penis. David refused, upon which the boy began rubbing his penis against David's body. David then pushed him off and the older boy stopped.

As is common of young children sexually abused as children, at an early age David was sexually curious and engaged in considerable sexual play with other children. When he was 7/8 years old, he and two neighbor children who were about the same age engaged in sexual play involving showing and touching each other's private parts. This sexual play stopped when the two other children were caught engaging in such behavior with each other. Also when he was 7/8 years old, for one year his young 9/10 year-old            lived with David's family. The two children would lay next to each other naked and kiss. At age 12, after David teased a boy and said he was a girl, the 12-year-old boy showed David his penis. From age 12 to 15, about half a dozen times, he and ,          who was slightly older would mutually fondle each other's genitalia.

**Pornography Viewing.** David Gonzalez was first exposed to pornography at age six or seven when a boy his same age sneaked him into the boy's parent's bedroom and showed him a pornographic video. From age 12 to 15, his parents rented a room to an adult male who had pornographic videos. About weekly he would view the pornographic videos absent awareness of the adults in his home. Around the same time, he occasionally saw pornography on TV.

At about age 15/16, Mr. Gonzalez got his first computer. While viewing a variety of websites, David once clicked onto an adult pornography site which included pictures of adult women and girls that appeared to be 12 to 15 years old. He discovered a "Lolasex" website, but the website was shut down within a few days. At about age 16/17, he began chatting on the Internet with people throughout the world and began downloading music through Limewire. He befriended a male from England, who shared a child pornography site. For the first time, David downloaded a video clip of a girl who appeared to be 12 years old posing naked. For the next few years, about a couple of times a month, he viewed several adult pornographic pictures and video clips and a few child pornography pictures and video clips.

When Mr. Gonzalez's dog died in November 2008, his interest and viewing of child pornography increased: "After he died, I started downloading child pornography nonstop. I don't know why. I wanted to find the people. If I ever saw them I would want to talk to them." Viewing the child pornography caused him to think of his own sexual molestation as a child and wonder if the children depicted in the child pornography felt as he did when he was victimized. A few months before his arrest, he found a website in which one could tell the story of one's sexual abuse. After telling his story, he received several responses from people who had similar experiences and from others who encouraged him to tell someone. It felt good for him to write about his sexual molestation because it felt as if someone was finally listening to him. He exchanged pictures with some people and wondered if he might recognize any of them in the child pornography.

When asked details about the child pornography, Mr. Gonzalez described that he downloaded adult and child pornography video clips and pictures. The downloading would at times take an entire day after which he would view very little of what he had downloaded but save all that he had

4

downloaded on an external hard drive. He once attempted to delete all the pornography he had downloaded but was unsuccessful in fully deleting it. He later resumed downloading it.

His favorite stimuli were pictures or videos of young girls between the ages of eight and 15, posing naked or with their underwear and appearing to be happy and smiling at the camera while they were posing. When asked why such were his favorite, he described that when they were smiling at the camera it appeared as if they were smiling at him. He acknowledged having masturbated to such pictures and video clips but to have felt guilty thereafter because he was aware of the wrongfulness of his actions. However, such feelings did not deter him from his continued interest in such stimuli. He denied having interest in or having masturbated to pictures or video clips of underage boys.

When asked what faulty reasoning he used to engage in behavior that he knew was wrong, Mr. Gonzalez stated, "That it's okay cause they weren't there. I wasn't doing it." When asked if he felt there was a connection between his sexual abuse and his interest in child pornography, he stated, "Yes, that's how everything started. The curiosity and me wanting to touch and see other kids. I always ask myself what would happen if that had never happened. I believe my life would have been totally different.... I think the main thing was it reminded me of what I went through. It kind of made me know there were other people who went through the same thing. I wasn't the only one....But I never understood why I was aroused by it. Maybe cause I went through it."

**Post Offense and Plans if Afforded Probation:** In reflection of his possession of child pornography offense, Mr. Gonzalez stated, "I think it's bad. At one point I was hoping I'd get caught. I don't know. I used to tell myself I hope I get caught. I don't know if I wanted everything to be out in the open.... I regret it. I regret ever typing in the first word I ever typed in. I'm not a bad person. I would never hurt anyone.... I will never download again anything ever again that would be illegal. I will never do it again in my whole entire life. I don't even want a computer anymore. And if this hurt anyone, I apologize. I apologize to everyone."

If granted probation, Mr. Gonzalez would continue to live with his parents and would attempt to resume his camera salesman job at Best Buy. He expressed willingness to follow up at the Northern Nevada Adult Mental Health Services for medication follow-up and counseling. He expressed willingness to continue taking his medicine. When asked if he would be willing to participate in sex offender treatment, Mr. Gonzalez expressed willingness to participate in such if court ordered. He noted that he is very private and has difficulty opening up with people, but realizes that addressing his history of sexual victimization and interest in child pornography would be helpful.

## RELEVANT PERSONAL BACKGROUND INFORMATION

**Family of Origin and Childhood History.** David Gonzalez was born             in Mexico. He was born Jose Gonzalez, but changed his name to David Gonzalez as an adult. When he was two years old, he and his mother,              immigrated to the United States. He does not know his biological father. His stepfather,             , entered his life when he was five years old. He had no fetal alcohol or drug exposure and reached developmental milestones normally.

Mr. Gonzalez was raised very isolated, absent siblings, cousins, or many friends. He endorsed childhood traumas from about age 7/8 to 12 involving emotional and physical abuse at the hands of             and sexual abuse by             . He recalled once having a belt mark upon his leg and another time having scratched marks down his back after             scratched him. The physical abuse was confirmed by his mother who described that from about age 6 to 12 she was

5

"gross" or rough with him and would weekly discipline him with use of her hand, belt, or other object such that he experienced marks and welts. In response to such discipline, he was fearful of his mother and verbally and physically withdrawn. At school he was also shy and withdrawn. He has not disclosed the sexual abuse to his parents.

Concurrent with this abusive period, Mr. Gonzalez began to hear voices and see shadows. During that period of time, his parents would frequently leave him home alone while they worked. In the morning, he would hear his mother's voice calling his name but she was not home. Each time he reached for the door, he would hear his name screamed and echoed throughout the room. Around that period of time, he also began to see shadows of people. He recalled a shadow of a female witch sitting suspended above the couch in the living room. When at about age eight he and his family went to Mexico, he stopped hearing voices and seeing shadows of people. Upon returning to the United States, the voices and shadows returned. Additionally, he would experience the sensation that someone was touching him throughout his body. At age 12, he once felt as if someone was jumping upon him as he lay on the ground. As an adolescent and adult, he continued to hear the voice of his mother or "random voices," but they were discernible. Once, he heard several voices at one time and experienced the voices coming closer and closer to him, but then the voices stopped.

Mr. Gonzalez described that at the end of his eighth-grade year, in response to pressures he was feeling at the time, he began to cut his wrist and forearm with a razor blade. He switched to cutting himself on his upper right arm so that people wouldn't see the cuts. Once he cut his leg. When explaining his cutting, he described, "I get distracted and I like feeling that pain.... When I shower and water gets in, it hurts so calms me down." He described that the scars of some of the cuts are still visible, but as he showed me his arms, this psychologist was unable to see the scars.

**Mental Health History: November 2008 (Death of his Dog) to the Present.** As a child and adolescent, Mr. Gonzalez had no mental health treatment. When his dog died in November 2008, in response to losing his dog, Mr. Gonzalez cut his wrist with a razor blade and took about nine of his mother's friend's antidepressant pills. His parents took him to Renown Medical Center, after which he was referred to the Northern Nevada Adult Mental Health Services (NNAMHS). He described that twice at NNAMHS, they wanted to hospitalize him, but he fled the grounds to avoid hospitalization. As an outpatient at NNAMHS, he was prescribed the mood stabilizer Lithium, the antipsychotic medicine, Risperdal, and other medicines. When asked why he was prescribed such medicines, he described, "I was seeing things, shadows and stuff like that, sort of like people." He has heard the doctors refer to the diagnoses *Bipolar Disorder* and *Schizophrenia.*

Mr. Gonzalez described that during the past two years, he has heard voices less often but still sees shadows. One year ago he heard a person singing in his ear. Daily, he would see shadows passing by the hall through the kitchen. At times he perceives that the lights in the room are dimming, but then he believes that such may just be in his head. Mr. Gonzalez described that as a child, such experiences caused him to believe he was going crazy. However, he has become used to the voices and shadows and is longer scared by them. He typically ignores them when he experiences them.

Mr. Gonzalez described that since 2008, he is "depressed a lot," particularly when he thinks of his dog. He continues to engage in occasional self mutilation. He typically cuts himself in response to increased pressures including school pressures, work pressures, and his mother going on and on about her health, dying, and her doctors. He also cuts himself when he feels overwhelmed at the loss of his dog and once lightly carved his dog's name into his arm. He quit cutting himself six

6

months prior to his arrest when he got a job at Best Buy. He didn't want his employer to notice his cuts and was optimistic about his new job.

When asked about his dog, Mr. Gonzalez described that when he was 10 years old he got a puppy, Otis. In 2008, Otis developed cancer and couldn't walk. He underwent surgery and was sent home with morphine injections. Eventually, Otis was able to walk and appeared absent pain. After one month, he was again unable to walk and in pain. When he asked the veterinarian to again prescribe Otis the morphine injections, the veterinarian refused to prescribe the injections but prescribed him pain pills. Otis deteriorated, was in considerable pain, and eventually died.

Mr. Gonzalez described that he blamed the veterinarian for the pain, suffering, and death of his dog. He believes that the veterinarian didn't do all that he could do to help his dog and alleviate his pain. When he gets angry, Mr. Gonzalez thinks of hitting the veterinarian but denied intent to do so. He does not remember the name of the veterinarian. In 2008, the veterinarian did surgery at several veterinary hospitals, including                          where his dog was treated. He has seen the veterinarian several times in the community, most recently at Wal-Mart and Office Depot. When he sees him in the community, Mr. Gonzalez turns away because he does not want to interact with him.

Mr. Gonzalez's mother described that in response to her son's dog dying in November 2008, he had a mental breakdown. The dog had cancer, underwent surgery, and eventually died. When his mother told David that his dog had died, David "passed out." They took him to the emergency room at Washoe Medical Center and he required four-point restraints and an injection of what was likely a major tranquilizer to calm him down. Upon his release later that day, he was referred for follow-up treatment at the Northern Nevada Adult Mental Health Services. He was prescribed the antidepressant medicine Lexapro, the mood stabilizer Lithium, and the antipsychotic Risperdal. Mr. Gonzalez's mother described that the medicine caused him to have an almost "drunken" appearance. For about five months he appeared to be in his own world, would laugh for unknown reason, would at times appear to be speaking to himself, and when approached would pull at his mother's hair or blouse, grab her, or scratch her in playful fashion. During a five-month period, his mother took him to her work to watch over him as he was not able to work at his former place of employment considering his mental state. Eventually they chose to discontinue the medicine and he gradually began to appear like his former self.

Mrs. Gonzalez described that her son mentally deteriorated after the death of his dog. Because she had taken the dog to the veterinarian, not given her son the opportunity to say goodbye to the dog, and had thrown away all the dogs belongings, it took him some time to accept that the dog had died. He repeatedly asked his mother if she was telling him the truth. When he requested his dog's ashes, his mother had to tell him that although she had been offered the ashes, she had refused them.

Thrice, David expressed to her that he wanted to seek revenge upon the veterinarian that cared for his dog because he felt the veterinarian had done nothing to save his dog, who was like a son to him. His mother explained to him the inappropriateness of such. She first heard him express this immediately after his dog died and last heard him express this about seven to eight months ago.

During the past two years he has dispelled God and expressed belief in the devil. He says God doesn't exist and he is going to study the devil. He once said that someday the devil was going to come and kill God, hit him with a nail upon his head, and worms were going to come out of God's head. He draws pictures of the devil beating God. He repeatedly states, "What is the use of life if one is going to die."

On one occasion shortly after the death of his dog, his mother observed that David had scratched or lightly cut himself on his arm with a razor blade absent drawing blood. When she confronted him about such he described that he wanted to feel the same pain that his dog had felt. She expressed to him that such was inappropriate. A few days later he reassured his mother that he was not going to kill himself. She was unaware of any other episode in which he had hurt himself or cut himself.

Mrs. Gonzalez described that she thought her son was doing better during the six months prior to his arrest. He was working at Best Buy and liked his job. However, on April 6, 2011, for the first time his mother heard him express wanting to take his life. She had just been to the doctor and was diagnosed with high cholesterol. She was crying and expressing concern to him about her illness. He angrily responded to his mother that she always claims to have problems and, meanwhile, he wants to end his life. Mrs. Gonzalez confirmed that she is always focused upon her health and death and for years has been prescribed antidepressant medicine.

**Education History:** Throughout schooling Mr. Gonzalez qualified for special education services under the category of learning disabled. He graduated from Wooster high school with an adjusted diploma. He has taken classes at the University of Nevada, Reno, and Truckee Meadows Community College and has about 30 college credits.

**Employment History:** After high school, for about four years, Mr. Gonzalez worked part-time as a lube tech and then apprentice mechanic at Wayne's Automotive. For one year he worked as a salesman and computer technician at Office Depot. From November 2010 until his arrest in April 2011, he worked as a camera salesman at Best Buy. He described that if afforded the opportunity for probation, he could return to his job at Best Buy.

**Major Medical Problems:** Mr. Gonzalez denied acute medical problems and significant medical history.

**Alcohol/Substance Abuse/Addiction History:** Mr. Gonzalez denied alcohol and drug use. His mother confirmed such.

**Prior Criminal/Antisocial/Legal History:** Mr. Gonzalez has no juvenile legal history and no prior adult legal history.

**Relationship and Sex History:** Mr. Gonzalez first learned about sexuality at age seven as a victim of sexual molestation by            and at age eight is a victim of sexual molestation by a 15-year-old boy who was            He first discovered masturbation at about age 12. As a preadolescent and adolescent he masturbated about once a week to thoughts of girls at school or while viewing a pornographic movie borrowed from a friend or sneaked from the room of an adult male who was renting a room in his parents' home. As an adult, he has masturbated about once a month, typically to thoughts of old girlfriends and girls he has liked, pornographic movies on TV, and adult and child pornography on the Internet. His typical sex fantasies include females about his same age with whom he engages in kissing and sex. He also endorsed sex fantasies and sex behaviors involving him and a consenting partner spanking each other during sex but not hurting each other. He endorsed sex fantasies involving having sex with two women at the same time but has never engaged in such behavior. He denied incestuous sex fantasies but as a child he repeatedly laid naked and kissed a maternal aunt who was also a child at the time; he engaged in mutual fondling of genitalia with            when the two were adolescents; and he was the victim of sexual molestation at the hands of.            He denied other

behavior. He denied hands-on sexual fantasies and sexual behaviors involving a prepubescent or under age pubescent child, although he has masturbated to pictures and videos of prepubescent and under age pubescent girls. He denied sexual fantasies and sexual behaviors involving boys, men, exhibitionism, voyeurism, frotteurism, sadistic sex, masochistic sex, and bestiality. His interest in adult and child pornography is described in an earlier section. He denied problems with erectile functioning, orgasmic functioning, and lack of interest in sex.

Mr. Gonzalez described himself as having adult heterosexual interests. He first started to be interested in girls at age 8, a girl his same age. He first started "going out" with girls at age 10, again with a girl his same age. In middle school and high school, she had two girlfriends who he saw "on and off." From age 15 to 23, he has had four sexual partners, all "friends with benefits" in that they were more friends than girlfriends. These partners were about his same age. When asked if he has had a girlfriend as an adult, he replied, "Yeah, I guess." He described that one of his friends with benefits could be considered his girlfriend since they would get together off-and-on during the eight years they knew each other. Mr. Gonzalez's mother was unaware that his son ever had a girlfriend.

Mr. Gonzalez has never married and has no children. When asked if he hopes to marry someday, he described that his preference is to not marry. He explained, "I don't want to be with one girl a long time. I see my mom. I don't want to be with someone like my mom. My dad has lots of patience even though she keeps annoying him over and over. That, and of course the girls I've been with. Every girl I've gone out with has been crazy, too dramatic, screaming, and always wanting to party. And I don't like that….I prefer to be alone."

## TEST RESULTS

**Intelligence Testing and Review of Psychoeducational Records:** The *Test of Nonverbal Intelligence – 3 (TONI-3)* yielded an IQ of 88, at the 21st percentile and low average range of intelligence. At a 95% confidence level, his true intelligence likely falls between the IQ range of 80 and 96, between the 9th and 39th percentile.

Psychoeducational records from the Washoe County School District revealed that in elementary school, middle school, and high school, Mr. Gonzalez was eligible for special education under the category of specific learning disabilities, with disabilities identified in mathematical calculation and written expression. In 2001, he was described as shy, withdrawn, and unmotivated to do schoolwork, but for the most part he got along with peers and adults. In 2004, he was described as pleasant and cooperative but with minor difficulty with motivation.

**Personality Assessment:** The *Millon Clinical Multiaxial Inventory-III*, a test of personality and psychopathology, suggested that David Gonzalez produced a valid profile with willingness to acknowledge problems. He reported recent problems involving low self-confidence and loneliness. Personality-wise, he endorsed a combination of *Dependent and Narcissistic Traits*:

> Such characterize individuals who appear to be cooperative [and] confident, and … for whom the most prominent personality trait his low self-esteem. Individuals with similar scores tend to feel less gifted or worthy than others. This poor self image usually leads to insecurity and anxiety in competitive situations. Such individuals also tend to publicly overrate their own self-worth. This inclination may come from disparate assumptions that they hold about themselves, so that even though they do not value themselves in some areas, they seem to be highly

9

confident in others.  Often, however, this ego inflation is a defense reaction to the low self-esteem.  In either case, there is an obvious conflict between the two images that they tried to project.  This conflict may play out in vacillations between congeniality and obstructionistic arrogance.  On the positive side, these individuals usually are cooperative and congenial... qualities that provide a good foundation for developing effective coping strategies.  (Choca, 2004).

Mr. Gonzalez did not endorse antisocial or borderline traits, but his nearly decade-long engagement in self mutilation suggests borderline traits which tend to develop in the face of severe and/or protracted childhood abuse.  As adaptive and maladaptive personality-based coping mechanisms reached their limit, individuals are at risk of developing clinical symptoms.  Likely in response to present situational stressors but potentially reflective of longer-term issues, Mr. Gonzalez endorsed symptoms of anxiety and major depression.  He did not endorse symptoms reflective of bipolar disorder, somatization disorder, thought disorder, delusional disorder, or substance dependence.

The *Hare Psychopathy Checklist-Revised-2 (PCL-R-2)* suggested that David Gonzalez is not a psychopath.  When compared to North American male offenders, his PCL-R-2 score was at the 2nd percentile.  On Factor 1 (interpersonal/affective traits marked by remorseless and callous use of others), he scored at the 24th percentile.  On Factor 2 (social deviance marked by an unstable and antisocial lifestyle), he scored at the 13th percentile.  Psychopathy is a reliable predictor of violence and sexual reoffense.

## DIAGNOSTIC IMPRESSION

Axis I (Clinical Disorder):  Schizoaffective Disorder, Depressive Type
Adjustment Disorder with Anxiety
Sexual Disorder Not Otherwise Specified (Viewing of Child Pornography)
Rule Out Pedophilia
History of Learning Disorder (Written Expression and Math)

Axis II (MR/Personality Disorder):    No Personality Disorder
Dependent, Narcissistic, and Borderline Traits

Axis III (General Medical Condition):  Self-report suggested no acute medical problems

Axis IV (Psychosocial and Environmental Stressors): Crime, arrest, incarceration; death of dog in 11/08; history of childhood emotional, physical, and sexual abuse

Axis V (Global Assessment of Functioning):  50–severe symptoms or severe impairment in functioning

**CONCLUSION:**  David Gonzalez was referred for psychosexual and risk assessment by defense attorney, Thomas Viloria, Esq.  Mr. Gonzalez was charged with possession of child pornography for acts on or about April 6, 2011 involving knowingly possessing and knowingly accessing with the intent to view any matter that contains an image of child pornography that had been mailed, and shipped and transported in interstate and foreign commerce by any means, including by computer, and that was produced using materials that had been mailed, and shipped and transported in interstate and foreign commerce by any means, including by computer.

Mr. Gonzalez acknowledged culpability to the possession of child pornography offense.  He described that at age 15/16, he began to view adult pornography on the Internet upon which he also

became exposed to child pornography. From age 16 until the time of his arrest he viewed both adult and child pornography and shared such via peer-to-peer file-sharing programs. After the death of his dog in November 2008 and a psychotic and suicide episode: "I started downloading child pornography nonstop." His favorite stimuli were pictures or videos of young girls typically between the ages of eight and 15, posing naked or with their underwear and appearing to be happy and smiling at the camera while they were posing. He admitted to being aroused by and to have masturbated to such stimuli and feels disturbed by such.

At a minimum, Mr. Gonzalez's sex offending behavior meets the criteria for *Sexual Disorder Not Otherwise Specified (Viewing of Child Pornography)* and suggests *Pedophilia* or sexual arousal to prepubescent children. However, considering his history of childhood emotional, physical, and sexual victimization, sexual and relationship challenges subsequent to such, and the development of severe mental health problems including loss of contact with reality, as to whether he actually has a pedophilic sexual orientation warrants further exploration in treatment *(Rule Out Pedophilia)*.

Historical, situational, emotional, personality, and other factors may be contributory factors to sex offending behavior although they may not fully account for the behavior. Additional factors which may have potentially contributed to his sex offending behavior include the following

1. *History of Multiple Childhood Traumas and Predisposition to Mental Health Problems*. Mr. Gonzalez endorsed multiple and severe childhood trauma including:

   a. Emotional and physical abuse at the hands of his mother when he was 7/8 to 12 years old such that he frequently sustained marks upon his body and would have been eligible for removal by Child Protective Services were such abuse to have been discovered.
   b. Sexual abuse at the hands of     (    ), also when he was seven to 12 years old. His perpetrator repeatedly fondled him, had him take his clothes off, once digitally penetrated his anus, and once took Polaroid pictures of him in the nude.
   c. Sexual abuse at age eight by a 15 year old      who on one occasion rubbed his penis against his body.
   d. Maternal mental health problems in that his mother has suffered from clinical depression, has been prescribed antidepressant medicine, and frequently exposed her son to potentially histrionic concerns about her health and death.

Although some children exposed to multiple traumas are resilient and absent significant problems as adolescents and adults, other children develop maladaptive coping mechanisms, maladaptive personality traits, and clinical symptoms in response to such traumas. Mr. Gonzalez' was absent sufficient intellectual and emotional fortitude to survive his traumas. He is low average in intelligence, has a *History of Learning Disorder (Written Expression and Math)*, and was in special education throughout schooling. Absent resilience, he developed problems as a child, adolescent, and adult pursuant to his traumas. Such problems were manifested in:

   a. Periods of loss of touch with reality – hearing voices and seeing shadows – as a child, adolescent, and adult.
   b. Self mutilation with a razor blade beginning in the eighth grade and progressing into adulthood, in an attempt to cope with and escape his emotional pain *(Borderline Traits)*.
   c. Sexual curiosity and sexual play with other children.
   d. A compromised sense of self such that he has low self esteem, is insecure and anxious in social situations, but attempts to mask such by publicly overrating his own self-worth *(Dependent and Narcissistic Traits)*.

11

2. *Early Exposure to Pornography.* In addition to early exposure to sexuality via sexual molestation, Mr. Gonzalez had early exposure to pornography. He first viewed an adult pornographic video at age 6/7. He viewed adult pornographic videos about weekly from age 12 to 15. He began viewing Internet adult and child pornography at age 15/16. Both the early sexual molestation and early exposure to pornography caused him to experience feelings of arousal before he was of age to know how to adequately handle such feelings and likely arrested his sexual development such that it remained fixated upon youth.

3. *Mental Health Crisis.* Pursuant to the death of his dog in November 2008, David Gonzalez engaged in self mutilation by cutting his wrists with a razor blade, attempted suicide by taking antidepressant medicines, and suffered his first psychotic break with symptoms of auditory and visual hallucinations. He was treated at Renown Medical Center, had follow-up outpatient treatment at the *Northern Nevada Adult Mental Health Services,* and was prescribed the antidepressant medicine Lexapro, the mood stabilizer Lithium, and the antipsychotic Risperdal. His acute symptoms eventually subsided and he discontinued his medicines. However, he became obsessed with the death of his dog, fantasies to harm or kill the veterinarian, and the downloading of child pornography. His mood continued depressed and as stressors increased, he continued to engage in self-mutilation with a razor blade and the viewing of child pornography to alleviate his pain. During the one month prior to his arrest, Mr. Gonzalez harbored passive suicide ideations absent intention. Pursuant to his arrest for the present offense, he suffered a second psychotic break with accompanying suicide and homicide ideations and lightly scratching himself with a paperclip in an attempt to ease his emotional pain. While incarcerated, he has been prescribed the antipsychotic medicine Thorazine, which helped remit his symptoms. At the time of evaluation, visual hallucinations were in remission, auditory hallucinations were nonintrusive and able to be ignored, and suicide and homicide ideations were absent. This psychologist's diagnostic impression is *Schizoaffective Disorder, Depressive Type,* with concurrent presence of *Schizophrenia* and a *Major Depressive Disorder.* In response to his present stressors, he presently meets the criteria for *Adjustment Disorder with Anxiety,* but such is expected to resolve as stressors resolve.

4. *Relationship Problems.* Considering Mr. Gonzalez's childhood traumas, problematic relationship with his emotionally challenged mother, and maladaptive personality traits, he has underdeveloped interpersonal relationship skills and has failed to establish a healthy heterosexual relationship with an adult woman. Although he has had "girlfriends" such relationships have involved more "friends with benefits" rather than healthy, stable partner relationships. He tends to be a loner, prefers to never marry, and likely felt more comfortable in his fantasy pornography world rather than the real world.

5. *Unresolved Feelings Regarding His Sexual Molestation.* Although most individuals who have been childhood victims of sexual molestation do not commence viewing child pornography, Mr. Gonzalez's unresolved feelings regarding his sexual molestation, which he kept secret, likely fueled his interest in child pornography. Viewing the victimization of other children reminded him of his own victimization. On the Internet, he told the story of his sexual victimization and received replies in support. However, upon exchanging pictures with individuals who were sexually victimized as children, he became obsessed with trying to identify them in the child pornography photos.

On a positive note, David Gonzalez is not an antisocial or psychopathic individual. He is compliant and cooperative by nature. He has residential and employment stability, having lived in Reno most of his life and having recently been employment as a camera salesman at Best Buy. He has no prior juvenile or adult legal history including no prior sex offense or violence offense.

**Risk of Sexual Reoffense**: The *Sexual Violence Risk-20 (SVR-20)*, an empirically-devised risk assessment measure which focuses upon static and dynamic risk factors, was used to assist in making a clinical prediction about the defendant's chance of sexual reoffense. Risk assessment instruments are not definitive measures of sexual reoffense and have no absolute predictability. Instead, they are useful tools to identify risk factors and protective factors used to make a decision about the level and type of intervention that a defendant might require to ensure community safety.

The *SVR-20* suggested that Mr. Gonzalez poses a low-moderate risk of sexual reoffense. He does not pose a high risk of reoffense. Most offenders who score in the *low* risk range and many who score in the *moderate* risk range can be safely supervised and treated in a community setting. Offenders who score in the *high* risk range generally require incarceration to protect the public. Treatment can help manage risk. Mr. Gonzalez fell into a risk category that suggests he can be safely supervised and treated in the community. He is viable candidate for probation.

*SVR-20* risk factors which were <u>present</u> in Mr. Gonzalez's case are:

> <u>Psychosocial Adjustment</u>
> Deviant sexual preference: *Sexual Disorder Not Otherwise Specified (Viewing of Child Pornography); Rule Out Pedophilia*
> Victim of childhood emotional, physical, and sexual abuse
> *Schizoaffective Disorder, Depressive Type*
> *Adjustment Disorder with Anxiety*
> Recent and past suicidal and homicidal ideations and self mutilation
> Relationship problems; has failed to establish and maintain stable intimate relationships
>
> <u>Sexual Offenses</u>
> Sex offending period spanned several years
> Escalation in frequency of sex offending behavior in 2009 to 2010
>
> <u>Future Plans</u>
> History of stopping mental health treatment

*SVR-20* risk factors which were <u>absent</u> in Mr. Gonzalez's case are:

> <u>Psychosocial Adjustment</u>
> No *Antisocial or Psychopathic Personality Disorder*
> No present or past substance use problems; substances not involved in the sex offense
> Not an imminent suicide or homicide risk at this time
> No employment problems
>
> <u>Sexual Offenses</u>
> No past nonsexual violent offenses
> No past nonviolent offenses
> No past hands-on or hands-off sex offenses
> No multiple sex offense types
> No physical harm to a victim in sex offense
> No use of weapons or threat of death in sex offense
> No escalation in severity of sex offense
> No extreme minimization or denial of sex offense
> No attitudes that support or condone sex offense

13

Future Plans
No absence of realistic plan to avoid sex reoffense
No negative attitude toward intervention; no absence of willingness to participate in
      court-ordered treatment

**Risk of Hands-On Sex Offense.** There is considerable debate as to whether child pornography offenders pose a risk for hands-on sex offenses. Only a few studies have analyzed the association between child pornography offending and subsequent perpetration of hands-on sex offenses. In 2009, Swiss researches published a six year study of 231 male consumers of child pornography, most of whom had no previous convictions for hands-on sex offenses (Endass, Urbaniok, Hammermeister, Benz, Elbert, Laubacher, and Rossegger, 2009). When applying a broad definition of recidivism including ongoing investigations, charges, and convictions, 3% of the study sample recidivated with a violent and/or sex offense, 3.9% with a hands-off sex offense, and 0.8% with a hands-on sex offense. The researchers concluded that consuming child pornography alone is not a risk factor for committing hands-on sex offenses – at least not for those subjects who had never committed a hands-on sex offense. For offenders who had no previous convictions for hands-on sex offenses, the prognosis for hands-on sex offenses, as well as for recidivism with child pornography, was favorable.

In 2005, two Canadian researchers conducted a 2.5 year study of 201 adult male child pornography offenders (Seto and Angela, 2005). At follow-up, 17% of the sample criminally offended in some general way and 4% committed a new contact sex offense. Child pornography offenders with prior criminal records were significantly more likely to offend again in general during the follow-up period. Child pornography offenders who had committed a prior or concurrent sex offense were the most likely to offend again, either generally or sexually.

Considering that Mr. Gonzalez has no prior hands-on or hands-off sex offense arrest or conviction and has no prior criminal record, his prognosis for hands-on sex offenses, as well as for recidivism with child pornography, is favorable.

**Probable Nature of Future Sex Offending Behavior and Populations Potentially at Risk:** The assumption in most cases is that any future sexual misconduct will mirror the current and/or past sex offenses. That being the case, if Mr. Gonzalez were to recidivate, it would likely involve return to viewing of child pornography rather than hands-on sex offending.

**Treatment Needs and Amenability to Treatment:** Mr. Gonzalez is in need of a combination of mental health treatment and sex offender treatment, and presented as amenable to treatment. It is recommended that he resume medication follow-up at the *Northern Nevada Adult Mental Health Services* for management of his *Schizoaffective Disorder*, recent suicidal and homicidal ideations, and recent self-mutilation; and that he commence sex offender treatment that includes a combination of individual, family, and group therapy for management of his *Sexual Disorder* and accompanying relationship and personality issues. Considering that he plans to continue to live with his parents if afforded probation, involving his mother and stepfather in treatment would be helpful to address mother-son issues which may continue to challenge his mental health. His treatment providers should receive a copy of the present evaluation, coordinate treatment efforts, and be sensitive to not putting too much on his plate so that he can successfully manage continued employment and his dual treatment needs.

*Martha B. Mahaffey, Ph.D.*
Martha B. Mahaffey, Ph.D.
Clinical Psychologist
Diplomate in Forensic Psychology, American Board of Psychological Specialties

14

EXHIBIT 4

EXHIBIT 4

# Martha B. Mahaffey, Ph.D.

Clinical Psychologist, Nevada License #190

834 Willow St.  
Reno, NV 89502

(775) 323-6766  
FAX (775) 323-2716

## PSYCHOSEXUAL AND RISK ASSESSMENT - UPDATED

**Name: David Gonzalez**  
**Date of Birth:** ......  **Age: 25**  
**Placement:  Washoe County Detention Center**

**Case No.  3-11-CR-00055-HDM-RAM**  
**Evaluation Dates:  April 26 & May 2, 2011,**  
**July 15, 2011, and September 15, 2012**  
**Report Date:  September 17, 2011**

### EVALUATION INSTRUMENTS
1. Clinical Interview, including psychosexual interview, 4/26 & 5/2/11, 3.00 hrs.; 7/15/11, .5 hrs.; and 9/15/12, 1.5 hrs.
2. Test of Nonverbal Intelligence–3, 4/26/11
3. Millon Clinical Multiaxial Inventory – III, 4/26/11
4. Hare Psychopathy Checklist-Revised –2, 4/26/11
5. Risk Assessment:  Sexual Violence Risk-20 and review of meta-analysis of online sex offenders
6. Review of documents provide by defense counsel:  Discovery and Investigative Report; Memorandum of Plea Negotiation; Competency Evaluations at the U.S. Medical Center for Federal Prisoners, 10/14/11 and 5/18/1; Presentence Investigation Report, 9/12/12
7. Review of Washoe County School District psychoeducational records
8. Review of Washoe County Detention Center medical records
9. Collateral phone call, Alma Gonzalez, mother

**REASON FOR REFERRAL:**  David Gonzalez was referred for psychosexual and risk assessment by defense attorney, Thomas Viloria, Esq.  Pursuant to plea negotiation, Mr. Gonzalez pled guilty to receipt of child pornography.

Document review suggested that on February 28, 2011, a Federal Bureau of Investigation Innocent Images Task Force deputy marshal was conducting an undercover operation on the Gnutella –peer-to-peer file sharing network and identified an IP address having numerous child pornography files. The service address of the IP address subscriber was identified.  During a search of the residence on April 6, 2011, a forensic preview of David Gonzalez's HP laptop computer and external hard drive revealed several hundred images and videos of child pornography.  These images contained depictions of prepubescent children engaging in sexually explicit conduct.  In total, approximately 2000 images and videos were discovered on these electronic devices that were believed to contain child pornography.  During interview, Mr. Gonzalez admitted that he intentionally downloaded images and videos of child pornography from the Internet using peer-to-peer file sharing software. Mr. Gonzalez also admitted that after downloading the images and videos he would store his child pornography on his computer and external hard drive.  He admitted that he possessed at least a few hundred images of child pornography.  Finally, Mr. Gonzalez admitted that he had been collecting child pornography for many years and he believed he would not be able to stop engaging in this conduct.

**MENTAL STATUS EXAMINATION:**  David Gonzalez's mental status has fluctuated during the past one and one-half years of incarceration and is presented below per evaluation date.

**April 26 and May 5, 2011.** David Gonzalez, a 25-year-old Mexican national, was cooperative and respectful during initial evaluation. Physical presentation was notable for mild rocking back and forth. Affect or facial expression was serious or blunted. Mood was mildly anxious and depressed, potentially in response to his situational stressors, but absent a manic or elevated mood. He described his mood as, "Bad, every day I feel bad.... I hate being in here. I feel anxious. I feel like running and hitting the doors. I hate being here." He described that during his first week of incarceration, he repeatedly punched and kicked the door and walls and a couple of times he hit himself in the chest. During the subsequent weeks, such behavior had subsided. He described a general restlessness that may have been reflective of anxiety and/or medication side effects.

On April 26 and May 5, Mr. Gonzalez denied suicide and homicide ideations, but he endorsed suicide ideations during the one month prior to his arrest, during which time he felt, "There is no point in living." When asked what he thinks may have precipitated such thoughts, he explained that he has had such thoughts most of his life: "Death was a big issue for me 'cause mom was always talking about it." During the one month prearrest, he thought of various ways he might kill himself, including hanging himself, crashing his car into a wall, cutting his wrist, and jumping off the Circus Circus parking lot. However, he described that such were thoughts absent actual intent. The day before he was arrested, he thought of writing a letter stating, "If I died that would be okay because I don't' want to live anymore."

David Gonzalez described that upon his arrest, he was consumed with a variety of emotions and told authorities that he always wanted to die, that if he died today he wouldn't care, and that although he wouldn't kill himself he wished he would be dead already. He denied that he expressed imminent suicide intent. He described that he told authorities that if he ever found a veterinarian in a dark alley, he would want to beat him for what he had done to his dog, but he knows he wouldn't do it and he wouldn't kill him. He denied that he expressed imminent intent to kill the veterinarian. The Internet Crimes against Children Task Force Investigative Report described,

> It should also be noted Gonzalez described a desire to kill himself and an unknown veterinarian he had contact with a few years ago. Gonzalez was angered towards him for what he believed was a lack of care for his dogs before they died. Gonzalez claimed to not be able to remember what animal clinic or the veterinarian's name, but he did state he had seen him out in public on a prior occasion.... I chose to place Gonzalez in custody, pending an initial appearance before a magistrate. When informing Gonzalez of my decision, Gonzalez explained he had thought about it and realizes he wouldn't really kill the veterinarian, but he would seriously beat him near death so he could remember him.

The Complaint noted:

> Throughout the course [of the] interview, Mr. Gonzalez repeatedly indicated that he was considering suicide. He also indicated that he had previously attempted suicide in the past by various means. He also indicated that he intended to kill an unnamed veterinarian that he blamed for killing his dogs. He noted that before he killed himself, he intended to kill the veterinarian.

On May 2, 2011, regarding thoughts about the veterinarian, he stated, "I think things fix themselves in life and eventually something will happen to him, but not by me. Life will catch up with him. I'm not going to pursue that anymore."

On April 26, 2011, Mr. Gonzalez described that he found a paperclip in his room and was playing tic-tac-toe on his arm by lightly scratching on his arm but not causing it to bleed. He described, "It is a little bit of pain so it helps. Enough to keep distracted." On May 2, 2011, Mr. Gonzalez described that he still had the paperclip but had not scratched himself with it during the past week. For his safety, he was advised that this psychologist was going to disclose his scratching with the paperclip to the correctional deputies so that he could surrender the paperclip to them for his safety. Although frustrated that I was not merely allowing him to throw it away, he surrendered the paperclip without incident. Deputies asked to see his arms and confirmed that he had no self-inflicted injuries. Mr. Gonzalez has a history of self-mutilation with a razor blade.

Thought process was focused. Thought content was absent delusions, hallucinations, or psychosis at the time of interview and he did not appear to be responding to internal stimuli. However, he described visual hallucinations during the first few days of incarceration and auditory hallucinations that continued to date but were indiscernible and able to be ignored. Mr. Gonzalez described that initially, he was put in a small room and he had a difficult time being in such a confined space. During the first week, he repeatedly kicked and punched the walls and door. He described visual hallucinations that caused fear and concern that he was crazy: "I felt scared. I thought I was going crazy again." During his first few days in jail, he saw "something like a UFO stuck in the wall." He also saw two cats -- one orange and one brown -- and experienced one of the cats as walking upon him on the bed and rubbing his face against his face. When asked if he felt that such were real experiences or not, he described that at the time they felt very real but that since they disappeared he realizes that they were not real.

Review of jail medical records revealed that Mr. Gonzalez was prescribed the antipsychotic medicine Thorazine and Vistaril. Diagnostic impressions included *Mood Disorder Not Otherwise Specified, Anxiety Disorder Not Otherwise Specified, and History of Bipolar Disorder, Schizophrenia, and Depression.* Mr. Gonzalez described that with the medicine, he has not had visual hallucinations and his thinking is clearer. He still hears voices, but they remain indiscernible and he is able to ignore them. The voices tend to appear when it is quiet and he is not focused upon something else. Once during the two-hour interview on May 2 but not the two-hour interview on April 26, while this psychologist was writing, he stated, "See, right now I just heard something talk. It came in my ear and out the other really fast."

July 15, 2011. Review of Washoe County Detention Center medical records suggested that on June 20 and 30, 2011, David Gonzalez reported increased auditory, visual, and tactile hallucinations and medical staff perceived him as decompensating. On July 2, 2011, he reported that he was seeing shadows and figures trying to "hold me down, kill me." He thought dead people were coming through, telling him to hurt himself. He had detailed drawings of his visions. His antipsychotic medicine Thorazine was increased to manage his worsening auditory and visual hallucinations and impulse control. On July 14, 2011, Mr. Gonzalez continued to endorse paranoid delusions and auditory, visual, and tactile hallucinations, with no abatement of symptoms since the increase in his medicine. He was banging his head on the wall and had scratched a cross on his hand to keep shadow people away." Mr. Gonzalez was transferred to the infirmary for suicide watch.

Interview by this psychologist on July 15, 2011 confirmed that David Gonzalez had significantly decompensated. Mental status was notable for flat, expressionless facial expression, no eye contact, a blank stare toward the ground, minimal verbal responsiveness, and slow latency of speech. He was disoriented to person, place, time, and purpose. When asked his name, he stated, "Gonzalez," but could not state his first name. He could not provide the current date and year, and stated that the month was

April. When asked his birthday, he stated, "I don't know." When asked his age, he stated that he was 22 when in actuality he is 25. He thought he was in the hospital and denied that he was in jail. When asked why he had handcuffs on, he stated, "I don't know."

Mr. Gonzalez did not recognize this psychologist from two months prior. After re-introducing myself and explaining the purpose of the visit, mid-interview Mr. Gonzalez asked who I was and if I was the psychiatrist he had seen the week prior. I again explained who I was. When asked the name of his attorney, he denied that he had an attorney. When asked about his recent court date, he denied that he had gone to court. When asked if he recalled having reviewed the guilty plea agreement related to his child pornography offense, he responded, " I don't know." He appeared perplexed by the questions.

When asked why he was in the infirmary, Mr. Gonzalez stated, "I don't know...They say...'cause I drew pictures." When asked what pictures he drew, he stated, "I don't know...The things I see." When asked what he sees, he stated, "It's a...it's people...and I'm tired of 'em....The people I keep seeing.... I don't know...I see these people....They're see through....They're bad. They're bad. They want to kill me. I'm tired of seeing them. I'm so tired."

When asked about a visible red cross potentially scratched on his left hand, he stated, "I don't know. I don't remember....It helps keep them away....They don't like the cross, but they're still there." The cross on his left hand appeared to be somewhat fresh, with the skin barely broken such that small scabs would likely develop but he would not require medical attention. He described also having a cross on his left wrist, but with the handcuffs it was difficult to see the cross. When asked who the crosses keep away, he stated, "The voices...I'm tired of voices....I don't know. I'm tired....They're horrible. They want me to look at them, but I don't want to look at them anymore....They want to kill me." When asked what the voices say, he stated, "I can't tell you. They told me I can't tell anybody. They're bad."

When asked about suicide thoughts, Mr. Gonzalez described, "I don't know. I don't know what I'm doing here....I think I'm going to die....I just want to die so everything stops. I'm tired." When asked if the voices tell him to hurt himself, he replied, "Yeah. They want to kill me. They want to kill me." When asked if the voices tell him to hurt others, he replied, "Yeah...other people...I don't know." While this psychologist was writing notes, Mr. Gonzalez withdrew and began to softly mumble to himself, moving his lips and appearing to be responding to internal stimuli. When attempts were made to re-engage him, he repeatedly stated that he wanted to see his mom, began softly crying, and returned to mumbling to himself, shaking his head, and rocking back and forth.

**October 14, 2011: Ralph Ihle, Ph.D., Chief/Forensic Psychologist, U. S. Medical Center for Federal Prisoners.** Dr. Ihle opined that Mr. Gonzalez *provisionally* met the criteria for *Schizoaffective Disorder, Depressive Type; and Borderline Personality Disorder*. He perceived that Mr. Gonzalez was "currently suffering from acute emotional or mental symptoms." He noted: "Mr. Gonzalez has reported or exhibited symptoms associated with a major depressive disorder (depressed mood, hypersomnia, loss of interest in daily activities, suicidal ideation and attempts, and flat affect) and psychosis (visual and auditory hallucinations, and delusional, paranoid thought process)." Dr. Ihle also noted, "[T]here is some information to suggest that Mr. Gonzalez may be exaggerating or embellishing any distress or symptoms he has experienced."

**May 18, 2012: Lee Ann Preston Baechet, Ph.D., ABPP, Forensic Psychologist, U.S. Medical Center for Federal Prisoners.** After review of records, psychologist testing including measure of response validity, and behavioral observations, Dr. Preston Baechet opined that: "Mr. Gonzalez is malingering symptoms of mental illness as well as cognitive deficits....The presence of malingering does not exclude the possibility that an individual may have a genuine mental illness. However, it

is simply not possible to accurately determine the presence of genuine symptoms of mental illness when an individual is clearly malingering." She opined that Mr. Gonzalez warranted the following diagnoses: *Malingering; History of Major Depressive Disorder, with Psychotic Features; History of Learning Disorder (Written Expression and Math); and Rule Out Borderline Personality Disorder.*

**September 15, 2012.** Review of Washoe County Detention Center medical records suggested that on June 20, 2012, Mr. Gonzalez arrived from the U.S. Medical Center for Federal Prisoners. At that time he was prescribed the antipsychotic medicine Zyprexa and the antidepressant medicine Zoloft. By September 15, 2012, Mr. Gonzalez was prescribed the antipsychotic medicines Zyprexa and Thorazine, the antidepressant medicines Zoloft, and Vistaril for sleep and had been transferred from the mental health unit to the general population.

Considering his variable mental status during the past 1 1/2 years and allegations that while at the US Medical Center for Federal Prisoners he may have been malingering, Mr. Gonzalez was gently confronted about such. He described that during the initial evaluation with this psychologist in April and May 2011, in the hopes that the evaluation would allow him to be afforded bail or be released on his own recognizance, he embellished his education, employment, and relationship history and minimized his mental health history for fear that I would perceive him as crazy. When the evaluation did not lead to his release, he felt emotionally devastated, his hallucinations worsened, and he repeatedly cut himself to feel better. Washoe County Detention Center mental health staff kept increasing his medicines and he felt overmedicated. He described that he did not recall my subsequent evaluation on July 15, 2011; such may have been due to him being in a genuine psychotic state. When transferred to the U.S. Medical Center for Federal Prisoners, his medications where readjusted and he felt improved. He heard from other prisoners that if he were to found crazy and not competent to stand trial, that he would not be prosecuted. Considering such, he attempted to do poorly on psychological tests in an attempt to appear crazy. Eventually, he learned from staff that if he was found not competent to stand trial that he could be involuntarily committed for an extended period of time. Thereafter, he stopped trying to appear crazy.

Upon his return to the Washoe County Detention Center, with his present medication regimen, he feels better: "I'm a little depressed. Some days are still bad but most days are good." He is now used to jail and, so, is less stressed out about being in jail. He described daily thoughts of hurting himself by scratching or cutting himself with a staple. When on the mental health unit, he scratched himself with a staple. He has not engaged in self-mutilation in general population because he was told that if he engaged in such behavior he would be returned to the mental health unit. He denied suicidal thoughts with intention or plan. He described that when frustrated, he may punch the wall with his fist or hit his head on the wall or the bed. He sported a slight bruise on his forehead which he attributed to banging his head. When asked about thoughts to harm others, he described that two days prior, he had thoughts of suffocating his cellmate absent intent or plan. He claimed that his cellmate did not do anything to precipitate such a thought. He denied present thoughts of harming his cellmate or others. At the time of evaluation, he did not present as an imminent suicide or homicide risk.

Physical presentation was notable for rocking back and forth and some weight gain. Facial expression was mildly flat or expressionless. Speech was mildly monotone. Thought process was focused. Thought content was absent delusions and auditory or visual hallucinations at the time of the interview. He described that on a daily basis he hears one of four voices -- an old man telling him he doesn't want to be here; the voice of his mother yelling out his name; a voice he has named

Charlie; and a fourth voice. He described also seeing "shadow people" and "see-through people." Recently, he began talking to God and going to church services. On occasion, he sees lights coming towards him and feels hands upon his body, which he and his mother believe is God coming to visit him and cure his body. God tells him everything is going to be okay. With the medicine, he is not distressed by the hallucinations.

## DEFENDANT'S ACCOUNT OF CHILD PORNOGRAPHY OFFENSE & RELATED ISSUES

**History of Sexual Abuse:** David Gonzalez described that when he was about seven years old, _____ lived with his family. On an almost daily basis,           would tease him and tell him that he wanted to grab him and see his penis. On one occasion,           put his hand down David's pants and grabbed his penis. After that incident,           went to Mexico. When David was eight years old,           returned to live with his family. He resumed molesting David, fondling his penis on an almost weekly basis. When David once asked him why he did this,           told him that it was okay because he was young and           was older. On another occasion,           described that he did the same thing to his own children.

When David was 9 1/2 to 10 years old, he and his parents moved into their present home and           continued to live with them. The fondling continued but progressed to 1           telling him to take off all his clothes. Once,           took Polaroid pictures of him as he stood by the window naked. On another occasion,           digitally penetrated his anus and told David that he was now "his." On several occasions,           asked him to lay in bed with him naked, but David refused. This sexual abuse continued until he was 12 years old. It ceased when           moved to Mexico.

David was also sexually molested at age eight by a 15-year-old boy, who was           . During a visit to Mexico, the two boys were sleeping together in the same bed. The older boy asked David to touch his penis. David refused, upon which the boy began rubbing his penis against David's body. David then pushed him off and the older boy stopped.

As is common of young children sexually abused as children, at an early age David was sexually curious and engaged in sexual play with other children. When he was 7/8 years old, he and two neighbor children who were about the same age engaged in sexual play involving showing and touching each other's private parts. This sexual play stopped when the two other children were caught engaging in such behavior with each other. Also when he was 7/8 years old, for one year his young 9/10 year-old           ived with David's family. The two children would lay next to each other naked and kiss. At age 12, after David teased a boy and said he was a girl, the 12-year-old boy showed David his penis. From age 12 to 15, about half a dozen times, he and a female           who was slightly older would mutually fondle each other's genitalia.

**Pornography Viewing.** David Gonzalez was first exposed to pornography at age six or seven when a boy his same age sneaked him into the boy's parents' bedroom and showed him a pornography video. From age 12 to 15, his parents rented a room to an adult male who had pornographic videos. About weekly he would view the pornographic videos absent awareness of the adults in his home. Around the same time, he occasionally saw pornography on TV. At about age 15/16, Mr. Gonzalez got his first computer. While viewing a variety of websites, David once clicked onto an adult pornography site which included pictures of adult women and girls that appeared to be 12 to 15 years old. He discovered a "Lolasex" website, but the website was shut down within a few days. At about age 16/17, he began chatting on the Internet with people throughout the world and began downloading music through Limewire. He befriended a male from

England, who shared a child pornography site. For the first time, David downloaded a video clip of a girl who appeared to be 12 years old posing naked. For the next few years, about a couple of times a month, he viewed several adult pornographic pictures and video clips and a few child pornography pictures and video clips.

When Mr. Gonzalez's dog died in November 2008, his interest and viewing of child pornography increased: "After he died, I started downloading child pornography nonstop. I don't know why. I wanted to find the people. If I ever saw them I would want to talk to them." Viewing the child pornography caused him to think of his own sexual molestation as a child and wonder if the children depicted in the child pornography felt as he did when he was victimized. A few months before his arrest, he found a website in which one could tell the story of one's sexual abuse. After telling his story, he received several responses from people who had similar experiences and from others who encouraged him to tell someone. It felt good for him to write about his sexual molestation because it felt as if someone was finally listening to him. He exchanged pictures with some people and wondered if he might recognize any of them in the child pornography.

When asked details about the child pornography, Mr. Gonzalez described that he downloaded adult and child pornography video clips and pictures. The downloading would at times take an entire day after which he would view very little of what he had downloaded but save all that he had downloaded on an external hard drive. He once attempted to delete all the pornography he had downloaded but was unsuccessful in fully deleting it. He later resumed downloading it.

His favorite stimuli were pictures or videos of young girls between the ages of eight and 15, posing naked or with their underwear and appearing to be happy and smiling at the camera while they were posing. When asked why such were his favorite, he described that when they were smiling at the camera it appeared as if they were smiling at him. He acknowledged having masturbated to such pictures and video clips but to have felt guilty thereafter because he was aware of the wrongfulness of his actions. However, such feelings did not deter him from his continued interest in such stimuli. He denied having interest in or having masturbated to pictures or video clips of underage boys.

When asked what faulty reasoning he used to engage in behavior that he knew was wrong, Mr. Gonzalez stated, "That it's okay 'cause they weren't there. I wasn't doing it." When asked if he felt there was a connection between his sexual abuse and his interest in child pornography, he stated, "Yes, that's how everything started. The curiosity and me wanting to touch and see other kids. I always ask myself what would happen if that had never happened. I believe my life would have been totally different... I think the main thing was it reminded me of what I went through. It kind of made me know there were other people who went through the same thing. I wasn't the only one....But I never understood why I was aroused by it. Maybe 'cause I went through it."

**Post Offense Reflections and Plans Upon Return to the Community:** In reflection of his possession of child pornography offense, on May 2, 2011, Mr. Gonzalez stated, "I think it's bad. At one point I was hoping I'd get caught. I don't know. I used to tell myself I hope I get caught. I don't know if I wanted everything to be out in the open.... I regret it. I regret ever typing in the first word I ever typed in. I'm not a bad person. I would never hurt anyone.... I will never download again anything ever again that would be illegal. I will never do it again in my whole entire life. I don't even want a computer anymore. And if this hurt anyone, I apologize. I apologize to everyone." On September 15, 2012, he stated, "I apologize for what I did, for downloading child pornography. And if there a victim – the children in the pictures – I apologize....I really apologize for what I did. This will never happen again. I'm just asking for another chance."

When allowed return to the community, Mr. Gonzalez would continue to live with his parents, return to school, and find a job. He expressed willingness to follow up at the Northern Nevada Adult Mental Health Services for medication follow-up and counseling. He expressed willingness to continue taking his medicine. He expressed willingness to participate in sex offender treatment if court ordered. He noted that he is very private and has difficulty opening up in groups, but realizes that addressing his history of sexual victimization and child pornography offense would be helpful.

## RELEVANT PERSONAL BACKGROUND INFORMATION

**Family of Origin and Childhood History.** David Gonzalez was born .                  i, in Mexico. He was born Jose Gonzalez, but changed his name to David Gonzalez as an adult. When he was two years old, he and his mother,                  , immigrated to the United States. He does not know his biological father. His stepfather, :                  entered his life when he was five years old. He had no fetal alcohol or drug exposure and reached developmental milestones normally.

Mr. Gonzalez was raised very isolated, absent siblings, cousins, or many friends. He endorsed childhood traumas from about age 7/8 to 12 involving emotional and physical abuse at the hands of his mother and sexual abuse by                  He recalled once having a belt mark upon his leg and another time having scratched marks down his back after                  : scratched him. The physical abuse was confirmed by his mother who described that from about age 6 to 12 she was "gross" or rough with him and would weekly discipline him with use of her hand, belt, or other object such that he experienced marks and welts. In response to such discipline, he was fearful of his mother and verbally and physically withdrawn. At school he was also shy and withdrawn. He has not disclosed the sexual abuse to his parents.

Concurrent with this abusive period, Mr. Gonzalez began to hear voices and see shadows. During that period of time, his parents would frequently leave him home alone while they worked. In the morning, he would hear his mother's voice calling his name but she was not home. Each time he reached for the door, he would hear his name screamed and echoed throughout the room. Around that period of time, he also began to see shadows of people. He recalled a shadow of a female witch sitting suspended above the couch in the living room. When at about age eight he and his family went to Mexico, he stopped hearing voices and seeing shadows of people. Upon returning to the United States, the voices and shadows returned. Additionally, he would experience the sensation that someone was touching him throughout his body. At age 12, he once felt as if someone was jumping upon him as he lay on the ground. As an adolescent and adult, he continued to hear the voice of his mother or "random voices," but they were discernible. Once, he heard several voices at one time and experienced the voices coming closer and closer to him, but then the voices stopped.

Mr. Gonzalez described that at the end of his eighth-grade year, in response to pressures he was feeling at the time, he began to cut his wrist and forearm with a razor blade. He switched to cutting himself on his upper right arm so that people wouldn't see the cuts. Once he cut his leg. When explaining his cutting, he described, "I get distracted and I like feeling that pain…. When I shower and water gets in, it hurts so calms me down." The scars of some of the cuts are still visible.

**Mental Health History: November 2008 (Death of his Dog) to the Present.** As a child and adolescent, Mr. Gonzalez had no mental health treatment. When his dog died in November 2008, in response to losing his dog, Mr. Gonzalez cut his wrist with a razor blade and took about nine of his mother's friend's antidepressant pills. His parents took him to Renown Medical Center, after which he was referred to the Northern Nevada Adult Mental Health Services (NNAMHS). He described

8

that twice at NNAMHS, they wanted to hospitalize him, but he fled the grounds to avoid hospitalization. As an outpatient at NNAMHS, he was prescribed the mood stabilizer Lithium, the antipsychotic medicine, Risperdal, and other medicines. When asked why he was prescribed such medicines, he described, "I was seeing things, shadows and stuff like that, sort of like people." Phone call from the U.S. Medical Center for Federal Prisoners to NNAMHS identified diagnoses of *Major Depressive Disorder with Psychotic Features and Borderline Personality Disorder.*

Mr. Gonzalez described that during the past two years pre-incarceration, he heard voices less often but still sees shadows. One year ago he heard a person singing in his ear. Daily he would see shadows passing by the hall through the kitchen. At times he perceives that the lights in the room are dimming, but he believes such are just in his head. Mr. Gonzalez described that as a child, such experiences caused him to believe he was going crazy. However, he has become used to the voices and shadows and is no longer scared by them. He typically ignores them when experiencing them.

Mr. Gonzalez described that since 2008, he is "depressed a lot," particularly when he thinks of his dog. He continues to engage in occasional self mutilation. He typically cuts himself in response to increased pressures including school pressures, work pressures, and his mother going on and on about her health, dying, and her doctors. He also cuts himself when he feels overwhelmed at the loss of his dog and once lightly carved his dog's name into his arm. He quit cutting himself six months prior to his arrest when he got a job at Best Buy. He didn't want his employer to notice his cuts and was optimistic about his new job.

When asked about his dog, Mr. Gonzalez described that when he was 10 years old he got a puppy, Otis. In 2008, Otis developed cancer and couldn't walk. He underwent surgery and was sent home with morphine injections. Eventually, Otis was able to walk and appeared absent pain. After one month, he was again unable to walk and in pain. When he asked the veterinarian to again prescribe Otis the morphine injections, the veterinarian refused to prescribe the injections but prescribed him pain pills. Otis deteriorated, was in considerable pain, and eventually died.

Mr. Gonzalez described that he blamed the veterinarian for the pain, suffering, and death of his dog. He believes that the veterinarian didn't do all that he could do to help his dog and alleviate his pain. When he gets angry, Mr. Gonzalez thinks of hitting the veterinarian but denied intent to do so. He does not remember the name of the veterinarian. In 2008, the veterinarian did surgery at several veterinary hospitals, including                    where his dog was treated. He has seen the veterinarian several times in the community, most recently at Wal-Mart and Office Depot. When he sees him in the community, Mr. Gonzalez turns away because he does not want to interact with him.

    **Collateral Phone Call,**                    **, mother.**                    described that in response to her son's dog dying in November 2008, he had a mental breakdown. The dog had cancer, underwent surgery, and eventually died. When his mother told David that his dog had died, David "passed out." They took him to the emergency room at Washoe Medical Center and he required four-point restraints and an injection to calm him down. Upon his release later that day, he was referred for follow-up treatment at the Northern Nevada Adult Mental Health Services. He was prescribed the antidepressant medicine Lexapro, the mood stabilizer Lithium, and the antipsychotic Risperdal. Mr. Gonzalez's mother described that the medicine caused him to have a "drunken" appearance. For about five months he appeared to be in his own world, laughed for unknown reason, appeared to be speaking to himself, and pulled at his mother's hair or blouse, grabbed her, or scratched her in playful fashion. For five-months, his mother took him to her work to watch over him. Eventually he discontinued the medicine and he began to appear like his former self.

described that her son mentally deteriorated after the death of his dog. Thrice, David expressed to her that he wanted to seek revenge upon the veterinarian that cared for his dog because he felt the veterinarian had done nothing to save his dog. His mother told him such was inappropriate. She first heard him express this immediately after his dog died and last heard him express this about seven to eight months prior to his arrest.

During the two years prior to his arrest, he dispelled God and expressed belief in the devil. He said God didn't exist and he is going to study the devil. He once said that someday the devil was going to come and kill God, hit him with a nail upon his head, and worms were going to come out of God's head. He drew pictures of the devil beating God. He repeatedly stated, "What is the use of life if one is going to die?"

On one occasion shortly after the death of his dog, his mother saw that David had scratched or cut himself on his arm with a razor blade absent drawing blood. When she confronted him about such he described that he wanted to feel the same pain that his dog had felt. She expressed to him that such was inappropriate. A few days later he reassured his mother that he was not going to kill himself. She was unaware of any other episode in which he had hurt himself or cut himself.

described that she thought her son was doing better during the six months prior to his arrest. He was working at Best Buy and liked his job. However, on April 6, 2011, for the first time his mother heard him express wanting to take his life. She had just been to the doctor and was diagnosed with high cholesterol. She was crying and expressing concern to him about her illness. He angrily responded to his mother that she always claims to have problems and, meanwhile, he wants to end his life. confirmed that she is always focused upon her health and death and for years has been prescribed antidepressant medicine.

**Education History:** Psychoeducational records from the Washoe County School District revealed that in elementary, middle, and high school, Mr. Gonzalez was eligible for special education under the category of specific learning disabilities, with disabilities identified in mathematical calculation and written expression. Mr. Gonzalez graduated from Wooster High School with an adjusted diploma. In 2011, he claimed to have taken classes at the University of Nevada, Reno (UNR), and Truckee Meadows Community College (TMCC) and to have 30 college credits. In 2012, he claimed to have taken solely taken on-line courses through TMCC and to have obtained 12 credits.

**Employment History:** After high school, for about four years, Mr. Gonzalez worked part-time as a lube tech and then apprentice mechanic at Wayne's Automotive. In 2011, he described that for one year he worked as a salesman and computer technician at Office Depot, and from November 2010 until his arrest in April 2011, he worked as a camera salesman at Best Buy. In 2012, he described that at Office Depot, he worked as a stocker, cleaned bathroom and carpets, and connected the computers to the internet; at Best Buy, he worked as a camera salesman.

**Major Medical Problems:** Mr. Gonzalez denied acute medical problems and significant medical history.

**Alcohol/Substance Abuse/Addiction History:** Mr. Gonzalez denied alcohol and drug use. His mother confirmed such.

**Prior Criminal/Antisocial/Legal History:** Self-report and Presentence Investigation Report, September 12, 2012, identifies no juvenile legal history and no prior adult legal history.

10

**Relationship and Sex History:** Mr. Gonzalez first learned about sexuality at age seven as a victim of sexual molestation by ⬛⬛⬛⬛⬛⬛⬛ and at age eight is a victim of sexual molestation by a 15-year-old boy who was ⬛⬛⬛ . He first discovered masturbation at about age 12. As a preadolescent and adolescent he masturbated about once a week to thoughts of girls at school or while viewing a pornographic movie borrowed from a friend or sneaked from the room of an adult male who was renting a room in his parents' home. As an adult, he has masturbated about once a month, typically to thoughts of old girlfriends and girls he has liked, pornographic movies on TV, and adult and child pornography on the Internet. His typical sex fantasies include females about his same age with whom he engages in kissing and sex. He also endorsed sex fantasies and sex behaviors involving him and a consenting partner spanking each other during sex but not hurting each other. He endorsed sex fantasies involving having sex with two women at the same time but has never engaged in such. He denied incestuous sex fantasies but as a child he lay naked and kissed ⬛⬛⬛⬛⬛ who was two years older; engaged in mutual fondling with ⬛⬛⬛ when the two were adolescents; and was the victim of sexual molestation at the hands of ⬛ ⬛ . He denied other incestuous behavior. He denied hands-on sex fantasies and sex behaviors involving a prepubescent or under age pubescent child, but has masturbated to pictures and videos of prepubescent and under age pubescent girls. He denied sexual fantasies and sexual behaviors involving boys, men, exhibitionism, voyeurism, frotteurism, sadistic sex, masochistic sex, and bestiality. His interest in adult and child pornography is described in an earlier section. He denied problems with erectile functioning, orgasmic functioning, and lack of interest in sex.

Mr. Gonzalez described having adult heterosexual interests. He first started to be interested in girls at age eight, a girl his same age. He first started "going out" with girls at age 10, again with a girl his same age. In middle school and high school, he had two girlfriends who he saw "on and off." In 2011, he described that from age 15 to 23, he had four sexual partners. In 2012, he described solely two sexual partners who were more friends than girlfriends about his same age. When asked if he has had a girlfriend as an adult, he replied, "Yeah, I guess." He described that one of his female friends could be considered his girlfriend since they would get together off-and-on during the eight years they knew each other. Mr. Gonzalez's mother was unaware that his son ever had a girlfriend.

Mr. Gonzalez has never married and has no children. His preference is to never marry. He explained, "I don't want to be with one girl a long time. I see my mom. I don't want to be with someone like my mom. My dad has lots of patience even though she keeps annoying him over and over. That, and of course the girls I've been with. Every girl I've gone out with has been crazy, too dramatic, screaming, and always wanting to party. And I don't like that….I prefer to be alone."

**TEST RESULTS**

**Intelligence Testing:** The *Test of Nonverbal Intelligence – 3 (TONI-3)* yielded an IQ of 88, at the 21st percentile and low average range of intelligence. At a 95% confidence level, his true intelligence likely falls between the IQ range of 80 and 96, between the 9th and 39th percentile.

**Personality Assessment:** The *Millon Clinical Multiaxial Inventory-III,* a test of personality and psychopathology administered in 2011, suggested that David Gonzalez produced a valid profile with willingness to acknowledge problems. At the time, he reported problems with low self-confidence and loneliness and endorsed *Dependent and Narcissistic Traits.* However, in 2012, it became apparent that his former endorsement of narcissistic traits was likely an attempt to look good rather than reflective of genuine narcissistic personality traits. *Dependent Traits,* marked by a pattern of submissive and clinging behavior related to an excessive need to be taken care of, were

11

evident in both 2011 and 2012.  Mr. Gonzalez did not endorse antisocial or borderline traits.  His nearly decade-long engagement in self mutilation including repeated scratching and cutting during his present incarceration suggests *Borderline Traits* which tend to develop in the face of severe and/or protracted childhood abuse.

As adaptive and maladaptive personality-based coping mechanisms reached their limit, individuals are at risk of developing clinical symptoms.  Likely in response to situational stressors in 2011 but potentially reflective of longer-term issues, Mr. Gonzalez endorsed symptoms of anxiety and depression.  He did not endorse symptoms reflective of mania, somatization, thought disorder, delusional disorder, or substance dependence.

The *Hare Psychopathy Checklist-Revised-2 (PCL-R-2)* suggested that David Gonzalez is not a psychopath.  He does not have interpersonal/affective traits marked by remorseless and callous use of others, nor socially deviant traits marked by an unstable and antisocial lifestyle.  Psychopathy is a reliable predictor of violence and sexual reoffense.

## DIAGNOSTIC IMPRESSION

Axis I (Clinical Disorder): Schizoaffective Disorder, Depressive Type
> Adjustment Disorder with Mixed Disturbance of Emotions and Conduct
> Sexual Disorder Not Otherwise Specified (Viewing of Child Pornography)
> Rule Out Pedophilia
> History of Learning Disorder (Written Expression and Math)

Axis II (MR/Personality Disorder):   Borderline Personality Disorder with Dependent Features

Axis III (General Medical Condition):  Self-report suggested no acute medical problems

Axis IV (Psychosocial and Environmental Stressors): Crime, arrest, protracted incarceration, anticipated imprisonment; death of a dog in 11/08; history of childhood emotional, physical, and sexual abuse

Axis V (Global Assessment of Functioning): 50–severe symptoms or severe impairment in functioning

**CONCLUSION:**  David Gonzalez was referred for psychosexual and risk assessment by defense attorney, Thomas Viloria, Esq.  Pursuant to plea negotiation, Mr. Gonzalez pled guilty to receipt of child pornography.

Mr. Gonzalez acknowledged culpability to the receipt of child pornography offense.  He described that at age 15/16, he began to view adult pornography on the Internet upon which he became exposed to child pornography.  From age 16 until the time of his arrest he viewed both adult and child pornography and shared such via peer-to-peer file-sharing programs.  After the death of his dog in November 2008 and a psychotic and suicide episode: "I started downloading child pornography nonstop." His favorite stimuli were pictures or videos of young girls typically between the ages of eight and 15, posing naked or with their underwear and appearing to be happy and smiling at the camera while they were posing.  He admitted to being aroused by and to have masturbated to such stimuli and feeling disturbed by such.

At a minimum, Mr. Gonzalez's sex offending behavior meets the criteria for *Sexual Disorder Not Otherwise Specified (Viewing of Child Pornography)* and suggests *Pedophilia* or sexual arousal to prepubescent children. However, considering his history of childhood emotional, physical, and sexual victimization, sexual and relationship challenges subsequent to such, and the development of severe mental health problems including loss of contact with reality, as to whether he actually has a pedophilic sexual orientation warrants further exploration in treatment *(Rule Out Pedophilia)*.

Historical, situational, emotional, personality, and other factors may be contributory factors to sex offending behavior although they may not fully account for the behavior. Factors which may have potentially contributed to his sex offending behavior include the following:

1.  *History of Multiple Childhood Traumas and Predisposition to Mental Health Problems.* Mr. Gonzalez endorsed multiple and severe childhood trauma including:

    a.  Emotional and physical abuse at the hands of his mother when he was 7/8 to 12 years old such that he frequently sustained marks upon his body and would have been eligible for removal by Child Protective Services were such abuse to have been discovered.
    b.  Sexual abuse at the hands of _____ (his _____), also when he was seven to 12 years old. His perpetrator repeatedly fondled him, had him take his clothes off, once digitally penetrated his anus, and once took Polaroid pictures of him in the nude.
    c.  Sexual abuse at age eight by a 15 year old male _____ who on one occasion rubbed his penis against his body.
    d.  Maternal mental health problems including clinical depression and frequently exposing her son to histrionic concerns about her health and death.

Although some children exposed to multiple traumas are resilient and absent significant problems as adolescents and adults, other children develop maladaptive coping mechanisms, maladaptive personality traits, and clinical symptoms in response to such traumas. Mr. Gonzalez was absent sufficient intellectual and emotional fortitude to survive his traumas. He is low average in intelligence, has a *History of Learning Disorder (Written Expression and Math)*, and was in special education throughout schooling. Absent resilience, he developed problems as a child, adolescent, and adult pursuant to his traumas. Such problems were manifested in:

    a.  Periods of loss of touch with reality or psychosis -- hearing voices and seeing shadows -- as a child, adolescent, and adult.
    b.  Self mutilation via cutting beginning in the eighth grade and progressing into adulthood, in an attempt to cope with and escape his emotional pain *(Borderline Personality Disorder)*.
    c.  Sexual curiosity and sexual play with other children.
    d.  A compromised sense of self, emotional immaturity and lability, and excessive dependence upon his parents *(Borderline Personality Disorder with Dependent Traits)*.

2.  *Early Exposure to Pornography.* In addition to early exposure to sexuality via molestation, Mr. Gonzalez had early exposure to pornography. He first viewed adult pornography at age 6/7. He viewed adult pornographic videos about weekly from 12 to 15. He began viewing Internet adult and child pornography at 15/16. Both the early molestation and exposure to pornography caused him to experience feelings of arousal before he was of age to know how to adequately handle such feelings and likely arrested his sexual development such that it remained fixated upon youth.

3. *Mental Health Disorder.*  Pursuant to the death of his dog in November 2008, David Gonzalez engaged in self mutilation by cutting his wrists with a razor blade, attempted suicide by taking antidepressant medicines, and suffered his first psychotic break with symptoms of auditory and visual hallucinations.  He was treated at Renown Medical Center, had follow-up outpatient treatment at the Northern Nevada Adult Mental Health Services, and was prescribed with psychotropic medicine.  His acute symptoms eventually subsided and he discontinued his medicines.  However, he became obsessed with the death of his dog, fantasies to harm or kill the veterinarian, and the downloading of child pornography.  His mood continued depressed and as stressors increased, he continued to engage in self-mutilation with a razor blade and the viewing of child pornography to alleviate his pain.  During the one month prior to his arrest, Mr. Gonzalez harbored passive suicide ideations absent intention.

Pursuant to his arrest for the present offense, Mr. Gonzalez suffered a second psychotic and major depressive break with accompanying suicide and homicide ideations and self mutilation in an attempt to ease his emotional pain.  During the past 1 ½ years of incarceration, his mental status has fluctuated, with a period of superimposed embellishment of symptoms in an attempt to evade prosecution.  Antipsychotic and antidepressant medicines have variably helped manage his symptoms but not fully resolved them.  This psychologist's diagnostic impression is that he meets the criteria for *Schizoaffective Disorder, Depressive Type*, with concurrent *Schizophrenia* and *Major Depressive Disorder*.  In response to his protracted incarceration and legal stressors, he also meets the criteria for *Adjustment Disorder with Mixed Disturbance of Emotions* (anxiety and depression) *and Conduct* (self-mutilation, feigning), but such is expected to resolve as stressors resolve.

4. *Relationship/Intimacy Problems.*  Considering Mr. Gonzalez's childhood traumas, problematic relationship with his emotionally challenged mother, and maladaptive personality traits, he has underdeveloped interpersonal relationship and intimacy skills and has failed to establish a healthy heterosexual relationship with an adult woman.  Although he has had "girlfriends" such relationships have been more "friends with benefits" rather than stable partner relationships.  He tends to be a loner, prefers to never marry, and likely felt more comfortable in his fantasy pornography world with a nonthreatening child rather than the real world with an adult female.

5. *Unresolved Feelings Regarding His Sexual Molestation.*  Although most individuals who have been childhood victims of sexual molestation do not commence viewing child pornography, Mr. Gonzalez's unresolved feelings regarding his sexual molestation likely fueled his interest in child pornography.  Viewing the victimization of other children reminded him of his own victimization.  On the Internet, he told the story of his sexual victimization and received replies in support.  However, upon exchanging pictures with individuals who were sexually victimized as children, he became obsessed with trying to identify them in the child pornography photos.

On a positive note, David Gonzalez is not an antisocial or psychopathic individual.  He is compliant and cooperative by nature.  He has residential stability, having lived in Reno most of his life.  Prior to his incarceration, he was employment as a camera salesman at Best Buy.  He has no prior juvenile or adult legal history including no prior sex offense or violence offense.

**Risk of Sexual Reoffense:**  A limitation of determining risk of sexual reoffense for online sex offenders is that there is no risk assessment measure specific to online sex offenders.  Research is needed to establish the extent to which the risk factors found for offline sex offenders also apply.  To determine risk for sexual reoffense, two approaches are applied:

14

The ***Sexual Violence Risk-20 (SVR-20)***,[1] an empirically-devised risk assessment measure which focuses upon static and dynamic risk factors in sex offenders in general, was used to assist in making a clinical prediction about the defendant's chance of sexual reoffense. The *SVR-20* suggested that Mr. Gonzalez poses a low-moderate risk of sexual reoffense.

*SVR-20* risk factors which were present in Mr. Gonzalez's case are:

Psychosocial Adjustment
Deviant sexual preference: *Sexual Disorder Not Otherwise Specified (Viewing of Child Pornography); Rule Out Pedophilia*
Victim of childhood emotional, physical, and sexual abuse
*Schizoaffective Disorder, Depressive Type*
*Adjustment Disorder with Mixed Disturbance of Emotions and Conduct*
Recent and past suicidal and homicidal ideations and extensive and persistent self mutilation
Relationship problems; has failed to establish and maintain stable intimate relationships

Sexual Offenses
Sex offending period spanned several years
Escalation in frequency of sex offending behavior in 2009 to 2010

Future Plans
History of stopping mental health treatment

*SVR-20* risk factors which were absent in Mr. Gonzalez's case are:

Psychosocial Adjustment
No *Antisocial or Psychopathic Personality Disorder*
No present or past substance use problems; substances not involved in the sex offense
Not an imminent suicide or homicide risk at this time
No lack of some employment stability

Sexual Offenses
No past nonsexual violent offenses
No past nonviolent offenses
No past hands-on or hands-off sex offenses
No self-report of hands-on sex offenses
No multiple sex offense types
No physical harm to a victim in sex offense
No use of weapons or threat of death in sex offense
No escalation in severity of sex offense
No extreme minimization or denial of sex offense
No attitudes that support or condone sex offense

Future Plans
No absence of realistic plan to avoid sex reoffense
No negative attitude toward intervention; no absence of willingness to participate in court-ordered treatment

**Meta-analysis of On-line Sex Offenders.** In 2010, Seto, Hanson, and Babchishin, conducted two meta-analyses.[2] The first meta-analysis examined the contact sex offense histories

15

of online offenders in 24 samples of online sex offenders. The second meta-analysis examined the recidivism rates from nine follow-up studies of online sex offenders. The first meta-analysis found that approximately one in eight online sex offenders (12%; n = 4464) have an officially known contact sex offense history at the time of their index offense; and, in the six studies that had self-report data, approximately one in two (55%; n = 288) online offenders admitted to prior sexual contact with children. The second meta-analysis revealed that 4.6% (n = 2630) of online offenders committed a new sexual offense of some kind during a 1.6- to 6-year follow-up; in the studies that reported type of sexual recidivism (n = 1247), 2.0% committed a contact sex offense and 3.4% committed a new child pornography offense. The results of these two quantitative reviews suggest that there may be a distinct subgroup of online-only offenders who pose a relatively low risk of committing contact sex offenses in the future.

In 2009, Endass, Urbaniok, Hammermeister, Benz, Elbert, Laubacher, and Rossegger, published a six year study of 231 male consumers of child pornography, most of whom had no previous convictions for hands-on sex offenses.[3] When applying a broad definition of recidivism including ongoing investigations, charges, and convictions, 3% of the study sample recidivated with a violent and/or sex offense, 3.9% with a hands-off sex offense, and 0.8% with a hands-on sex offense. The researchers concluded that consuming child pornography alone is not a risk factor for committing hands-on sex offenses – at least not for those subjects who had never committed a hands-on sex offense. For offenders who had no previous convictions for hands-on sex offenses, the prognosis for hands-on sex offenses, as well as for recidivism with child pornography, was favorable.

In 2005, Seto and Eke, conducted a 2.5 year study of 201 adult male child pornography offenders.[4] At follow-up, 17% of the sample criminally offended in some general way and 4% committed a new contact sex offense. Child pornography offenders with prior criminal records were significantly more likely to offend again in general during the follow-up period. Child pornography offenders who had committed a prior or concurrent sex offense were the most likely to offend again, generally or sexually.

Considering that Mr. Gonzalez has no prior hands-on or hands-off sex offense arrest or conviction, does not self-report prior hands-on sex offending behavior, and has no prior criminal record, his risk for hands-on sex offenses, as well as for recidivism with child pornography, is low.

Most offenders who score in the *low* risk range and many who score in the *moderate* risk range can be safely supervised and treated in a community setting. Offenders who score in the *high* risk range generally require incarceration to protect the public. Treatment can help manage risk. When considering both the *SVR-20* and research specific to online sex offenders, Mr. Gonzalez fell into risk categories that suggest he can be safely supervised and treated in the community.

**Probable Nature of Future Sex Offending Behavior and Populations Potentially at Risk:** The assumption in most cases is that any future sexual misconduct will mirror the current and/or past sex offenses. That being the case, if Mr. Gonzalez were to recidivate, it would likely involve return to viewing of child pornography rather than hands-on sex offending.

**Treatment Needs and Amenability to Treatment:** Mr. Gonzalez presented as amenable to treatment. He is in need of a combination of mental health and sex offender treatment. It is recommended that he resume medication follow-up at the *Northern Nevada Adult Mental Health Services* for management of his *Schizoaffective Disorder, Borderline Personality Disorder*, suicidal and homicidal ideations, and self-mutilation; and that he begin sex offender treatment for management of his *Sexual Disorder Not Otherwise Specified (Viewing of Child Pornography) vs. Pedophilia (Rule Out)*, relationship issues, and history of childhood sexual abuse. Considering that he plans to continue to live with his parents, involving his mother and stepfather in treatment would be helpful to address family issues which may

16

continue to challenge his mental health. His treatment providers should receive a copy of the present evaluation, coordinate treatment efforts, and be sensitive to his multiple stressors and treatment demands so that he can successfully manage continued employment and his multiple treatments.

*Martha B. Mahaffey, Ph.D.*

Martha B. Mahaffey, Ph.D.
Clinical Psychologist
Diplomate in Forensic Psychology,
    American Board of Psychological Specialties

[1]  Boer, D. P., Hart, S. D., Kropp, P. R., & Webster, C. D. (1997). Manual for the Sexual Violence Risk – 20. The Mental Health, Law, and Policy Institute, Simon Fraser University.

[2]  Seto, M. C., Hanson, K., & Babchishin, K. M. (2010). Contact Sexual Offending by Men with Online Sexual Offenses. *Sexual Abuse: A Journal of Research and Treatment. http://sax.sagepub.com/content/early/2010/12/19/1079063210369013.abstract*

[3]  Endrass, J., Urbaniok, F., Hammermesiter, L. C., Benz, C., Elbert, T., Laubacher, A., & Rossegger, A. (2009). The consumption of Internet child pornography and violent and sex offending. *BC Psychiatry, 9,* 43-50.

[4]  Seto, M. C., & Eke, A. W. (2005). The criminal histories and later offending of child pornography offenders. *Sexual Abuse: A Journal of Research and Treatment, 17,* 201-210.